**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RYAN DICKEY, on behalf of himself and all others similarly situated, | Case No.: 1:25-cv-5962 |
|                 Plaintiffs, | |
|    v. | |
| THE STRONACH GROUP, INC.; STRONACH GROUP SERVICES, LLC; CHURCHILL DOWNS, INC.; THE NEW YORK RACING ASSOCIATION; AMTOTE INTERNATIONAL, INC.; UNITED TOTE COMPANY; RACING AND GAMING SERVICES and ELITE TURF CLUB, LLC, | **JURY TRIAL DEMANDED** |
|                 Defendants. | |

## COMPLAINT

# TABLE OF CONTENTS

**Page**

I.       INTRODUCTION ................................................................................................ 1

II.     PARTIES ........................................................................................................... 3

      A.     Plaintiff .................................................................................................. 3

            1.     Ryan Dickey ................................................................................ 3

      B.     Defendants ............................................................................................. 4

            1.     AmTote International, Inc. .......................................................... 5

            2.     United Tote ................................................................................. 6

            3.     Elite Turf ................................................................................... 6

III.    JURISDICTION AND VENUE ....................................................................... 6

IV.    BACKGROUND INFORMATION ................................................................. 7

      A.     Pari-mutuel Wagering ........................................................................... 7

      B.     Types of Pari-mutuel Wagering Pools in Horse Racing ........................ 9

      C.     Advance Deposit Wagering ................................................................... 11

      D.     Computer-Assisted Wagering Teams ..................................................... 12

            1.     Elite Turf Club ........................................................................... 13

            2.     Velocity Wagering ..................................................................... 13

            3.     Racing & Gaming Services (RGS) ............................................. 14

      E.     The Role of AmTote and Totalizator Service Providers ....................... 14

      F.     How AmTote Interacts with Insider Betting Group ............................... 15

      G.     Reasons for the Rise in CAW Betting .................................................. 16

V.     THE ILLICIT SCHEME: INSIDER BETTING GROUP ADVANTAGES .................. 16

      A.     Pricing: The Insider Betting Group Far Lower "Effective Takeout" Allows Them to Profitably Play Strategies Unavailable to Retail Bettors .................................................................................................. 17

      B.     Speed and Pool Manipulation ............................................................... 17

      C.     Preferential Access and Execution Quality ............................................ 18

011348-11/3331884 V3

D.       Timing/Latency Edge at the Close.......................................................... 18

E.       Informational Advantage ..................................................................... 18

F.       Risk Management Across Pools ............................................................ 19

VI.    DEFENDANTS' CONTROL OVER PARI-MUTUEL BETTING POOLS ................... 19

A.       Host Racetracks Set Pricing and Access Rules...................................... 20

B.       Tote Companies Run the "Plumbing" of the Pools .............................. 21

C.       Content /Rights Arms Steer Where Handle Flows ................................ 21

D.       The ADW Platforms Control Consumer Wagering............................... 21

E.       Defendants' CAW Platforms ............................................................... 21

VII.   DEFENDANTS HAVE INCENTIVES TO PERMIT INSIDER BETTING
       GROUP  TO EXPLOIT THE BETTING POOLS ........................................ 22

VIII.  CLASS ACTION ALLEGATIONS ......................................................... 23

COUNT I: VIOLATIONS OF RACKETEER INFLUENCED AND  CORRUPT
       ORGANIZATIONS ACT (RICO) 18 U.S.C. § 1962(C), (D) (AGAINST
       ALL DEFENDANTS) ...................................................................... 26

       1.       The Members of the Pool Rigging Enterprise .......................... 26

       2.       The Predicate Acts .................................................................. 31

IX.    INJURY TO THE CLASS AS A RESULT OF THE OPERATION OF
       THE POOL RIGGING ENTERPRISE....................................................... 35

A.       Elite Admits It Damages Class Members .............................................. 36

B.       NYRA's and Stronach's Restrictions Admit the Insider Betting
         Group Damages Class Members.......................................................... 36

COUNT II: CONVERSION (AGAINST ALL DEFENDANTS)................................... 37

COUNT III: UNJUST ENRICHMENT (AGAINST ALL DEFENDANTS) ........................ 38

COUNT IV: CONSPIRACY (AGAINST ALL DEFENDANTS)................................... 38

PRAYER FOR RELIEF ........................................................................... 39

DEMAND FOR JURY TRIAL ...................................................................... 39

011348-11/3331884 V3

Plaintiff Ryan Dickey, individually and on behalf of all others similarly situated, alleges the following based upon the investigation of Plaintiff's counsel and on information and belief as follows:

## I. INTRODUCTION

> *Cash-strapped racetracks are selling out everyday bettors to whales who use algorithms to wager huge sums at friendlier odds. It's a rigged system designed for the rich to get richer.*

Banicki, *How Computer-Assisted Wagering Became Horse Racing's Insider Trading*, THE GUARDIAN (Nov. 1, 2024)

1.      This case arises from a scheme to manipulate the betting pools in horse races throughout the United States.

2.      Horse racing is said to be 'The Sport of Kings'.

3.      It may have been at one time, but today, it's a much broader sport, attracting billions of dollars globally in wagering and trading. For savvy quantitative and algorithmic groups, racing provides an outstanding opportunity to derive significant profit at the expense of the average bettor. These profits are the result of a scheme that has as its victim—the average public bettor—and has resulted in the transfer of billions to a small group of bettors and the operators of racetracks and betting platforms (the named defendants).

4.      In jurisdictions where general sports betting is restricted by law, horse racing is often the only sport on which betting is legal. In the vast majority of markets globally where quality horse races are run, bookmaking is illegal and pari-mutuel—or 'tote-based'—betting is the only legal form of betting.

5.      Pari-mutuel/tote models combine similar bet types within a race into individual pools from which a 'Takeout' is deducted. Takeout represents 'gross revenue' to racing's stakeholders, and can range from 6% to 31%, depending on the bet type. Once deducted, the

011348-11/3331884 V3

balance of the pool is paid to winning players, based on a proportional division of the net pool among those holding winning tickets. In simplest terms – and at the risk of stating the obvious, the lower the odds, the more money bet on that particular outcome, and thus the lower the return.

6.      In recent years, popular interest in horse racing has lessened, however, and betting has moved from the race track itself to telephone and internet-based accounts. Advances in computer technology and AI (Artificial Intelligence) based algorithms have created the means for a privileged group of insider "bettors" (the "Insider Betting Group") who control vast sums of money, to conspire with various elements of the horse racing industry, identified further herein as the defendants, to rig the United States betting pools in their favor to divert money from the betting pools to the Insider Betting Group to the defendants and away from the nonprivileged or average bettor. As a result of this scheme, the betting pools are not being operated lawfully as pari-mutuel wagering and have become illegal gambling operations. And the "odds" presented to the average bettor at the time a bet is placed are false as a result of the manipulation of the bettors' pool described below.

7.      The Insider Betting Group, employing Computer Assisted Wagering ("CAW") strategies as part of the conspiracy and illegal enterprise described below, are granted special terms and access to betting pools that the ordinary betting public does not enjoy. Because they bet in much higher volume than a typical player, and thus help enrich the defendants, they are given price advantages, special access to betting pools and informational advantages that are not available to members of the Class. These advantages give an unfair edge to the Insider Betting Group, essentially rigging the betting pools and making it impossible for Class members to bet on a true pari-mutuel basis, or at the odds they believe they are betting on. In many cases, given their preferential advantages, the Insider Betting Group participants enjoy no-risk, no-loss

"wagering" opportunities with respect to amounts now approaching nearly $4 billion (US) per year. The identity and make-up of members of the Insider Betting Group is kept secret, and the sources of their funds are not publicly known, but their identity is known to the defendants.

8.      Horse racing betting in the United States occurs pursuant to the laws of individual States that allow so-called pari-mutuel wagering (a system originally developed in France) based on the outcome of licensed horse races, and pursuant to which all bets are aggregated in a pool, a fee (the "takeout") is withdrawn and the remainder of the pool is paid to winning bettors. Thus, all winning bets are essentially paid by the losers. Pari-mutuel betting is intended to operate on an equitable, *pari passu* basis. Because of the unfair advantages provided to members of the Insider Betting Group they receive an inordinate share of the pools, taking profits that should rightfully should have been the property of Class Members. Members of the RICO enterprise have admitted in filings with certain regulations that the scheme benefits the Insider Betting Group at the expense of public bettors.

9.      Plaintiff brings this case as a proposed class action asserting claims under the Racketeering Influenced and Corrupt Organizations Act ("RICO") and under state law against those who have organized and participated in the corruption of the betting system to the detriment of the class.

## II.      PARTIES

### A.      Plaintiff

#### 1.      Ryan Dickey

10.      Plaintiff Ryan Dickey ("Plaintiff") is a resident of the state of Colorado. Plaintiff has extensive history of wagering on thoroughbred racing for at least the past 15-20 years. Up until about 18 months ago, Plaintiff (who was living in Kentucky at the time) wagered about $100 per weeks on racing, primarily through TwinSpires (the Advance Deposit Wagering

business owned by Churchill Downs, Inc.) Plaintiff expected that when he placed bets he was to receive any payout based on the odds one would expect from a betting system free from any agreement or scheme that rigged payouts to favor certain groups, i.e., members of the Insider Betting Group. Plaintiff was injured in his property as he incurred financial losses as a result of the scheme detailed below. When he became aware of the problems with the manipulation of the betting pools, he stopped betting on horse racing.

**B.     Defendants**

**The Stronach Group Defendants**

11.     Defendant Stronach Group Services, LLC is a Delaware limited liability company with its principal place of business in New Market, Ontario, Canada and has a registered agent in Frankfurt, Kentucky. Stronach Group Services, LLC acts as the holding company for all of its horse racing, gaming and technology businesses in the U.S.

12.     Defendant The Stronach Group, Inc. is a Canadian corporation formed under the laws of Ontario and headquartered in Aurora, Ontario. It is the parent company of Stronach Group Services, LLC.

13.     Combined, these entities, along with all of their operating divisions are hereinafter referred to as the "Stronach Group."

**Churchill Downs**

14.     Defendant Churchill Downs, Inc. ("Churchill Downs") is a Kentucky corporation headquartered in Louisville, Kentucky. Defendant Churchill Downs is a public company trading under the ticker symbol "CHDN." Churchill Downs is a U.S. horse racing, casino, and online wagering company best known for owning Churchill Downs Racetrack (home of the Kentucky Derby). Churchill Downs indirectly owns other racetracks, including Turfway Park, Ellis Park,

Colonial Downs and the Fairgrounds, and various other gambling-related businesses including the TwinSpires ADW and the Velocity CAW.

**NYRA**

15.     Defendant The New York Racing Association ("NYRA") is the nonprofit operator responsible for running thoroughbred racing at, *inter alia*, New York's three major tracks: 1) Aqueduct Racetrack; 2) Belmont Park; and 3) Saratoga Race Course. Together, these tracks host over 250 race days annually, attracting top horses, trainers, and jockeys from across North America. Combined, these tracks had a handle of more than $2 billion in 2024. NYRA operates under a franchise agreement with the State of New York, overseen by the New York State Gaming Commission (NYSGC). While technically independent, it functions as a quasi-public entity. In 2008, NYRA received a 25-year operating franchise while the State took title to the racetrack properties; a state Franchise Oversight Board monitors NYRA. Defendant NYRA also owns popular ADW platform NYRA Bets and 20% of CAW Elite Turf Club. NYRA's principal place of business is in Elmont, New York.

**1.      AmTote International, Inc.**

16.     Defendant AmTote International, Inc. ("AmTote") is a Maryland corporation with its principal place of business in Hunt Valley, Maryland and is a subsidiary of the Stronach Group based in Hunt Valley, Maryland. AmTote describes itself as the "largest pari-mutuel betting platform facilitator in North America, processing more than $15 billion in wagers annually."[1]

---

[1] https://www.amtote.com/.

2.    **United Tote**

17.    Defendant United Tote Company ("United Tote") is a Delaware corporation with its principal place of business in Frankfurt, Kentucky and is the other major U.S.-based "totalizator" provider for U.S. based pari-mutuel horse race betting. United Tote is majority-owned by Defendant Churchill Downs, which sold a minority (49%) position to Defendant NYRA on April 8, 2024.

3.    **Elite Turf**

18.    Defendant Elite Turf Club, LLC ("Elite") is a foreign limited liability company based in Curacao but has an office address in the U.S. at 8256 Turtle Creek Circle, Las Vegas, NV 89113-0129 and a registered agent at 120 W Sweet Avenue, Bismarck, ND 58504-5566.[2] Defendant Elite is owned 80% by Stronach Group and 20% by the New York Racing Association ("NYRA.")[3]

19.    Defendant Racing & Gaming Services (RGS) is a CAW service based in St. Kitts, with its principal place of business at Susan's Complex.

20.    Defendant Velocity is another major CAW service operating during the Class Period and is a wholly owned subsidiary of Defendant Churchill Downs.

### III.    JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because it is a class action where the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interests and costs, and the Plaintiff and most

---

[2] https://northdakota.ltddir.com/companies/the-elite-turf-club-nv/.

[3] Public Questions Regarding Computer Assisted Wagering, Letter from Elite Turf Club, LLC to California Horse Racing Board (Sep. 5, 2024), https://www.chrb.ca.gov/misc_docs/ Computer_Assisted_Wagering.pdf.

members of the proposed Class are citizens of a state different from each Defendant. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as this case asserts claims under 18 U.S.C. § 1964(a).

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, and/or has agents in this District, and because some of the actions giving rise to this Complaint took place within this District. Venue is also proper pursuant to 18 U.S. C. § 1965(a) and (b).

23.    This Court has personal jurisdiction over Defendants because Defendants have maintained substantial contacts, and/or committed overt acts in furtherance of the conduct alleged in the Complaint throughout the United States, including within this district. The conduct was directed at, or had the effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including within this judicial District.

24.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the mails and interstate telephone communications.

25.    Defendants each have sufficient minimum contacts within New York to make the exercise of jurisdiction over them by New York federal courts consistent with traditional notions of fair play and substantial justice.

## IV.    BACKGROUND INFORMATION

### A.    Pari-mutuel Wagering

26.    'Pari-mutuel' is French for "mutual betting."

27.    Credit for the pari-mutuel wagering system goes to an expatriate Spaniard who lived in France, Joseph Oiler. He came up with this kind of wagering in **1867** as a solution to bookmakers profiting greatly—too greatly, he apparently thought—from gullible bettors.

28.     France legalized pari-mutuel betting almost 25 years later. The country banned fixed odds wagering, and pari-mutuel profits went to either the government or horse racing. Today they go to many privately-owned commercial operators.

29.     From France, the pari-mutuel system made its way across the globe. Its spread may have slowed down somewhat at first due to the difficulty of determining payouts, proving that math anxiety ("arithmophobia") is not bounded by geography or time. Fortunately, in the 1920s an Australian engineer, George Julius, invented the "automatic totalizer" machine, which streamlined the process.

30.     Pari-mutuel wagering means everyone betting on the same outcome puts their money into a shared pool, the track takes a preset "takeout" to cover purses, taxes, and operations, and the remaining money is divided among the winning tickets.

31.     Unlike a sportsbook, the house isn't setting odds or taking risk—the payoff depends entirely on how other bettors bet. As money flows in, the posted odds move right up until the race goes off, so the final price you get can change after you place your bet.

32.     After the race, the track calculates the net pool and divides it by the total dollars on the winning selection to set the payout per dollar, then applies "breakage," which rounds payouts down to a fixed increment (often 10 cents).

33.     Pursuant to this formula, the odds and payouts are set as follows:

    a.      Money comes into a pool (*e.g.*, the Win Pool) from bets made by all bettors.

    b.      Track takeout is removed (varies by track and bet type), leaving the "Net Pool."

    c.      Net Pool ÷ dollars on the winner = payout per $1 bet.

    d.      Posted odds move right up to "off time" as money arrives; final odds can change after the gate opens because last minute bets are still being processed.

011348-11/3331884 V3

34.     For example, if the total amount bet on all horses in the Win Pool is $10,000 and the track's takeout is 16%, the Net Pool will be $8,400 ($10,000 - $1,600). If a total of $3,000 was bet on the #5 horse, the amount of the payout made to each winning $1.00 bet on the #5 horse will be $2.80 ($8,400/$3,000). A $2.00 winning ticket on the 5 horse will return $5.60.

35.     This system is unlike a typical sports bet where you make a bet against the sportsbook at a fixed price that does not change, leaving the sportsbook to shoulder the risk of loss. But in a pari-mutuel system, the bettor is betting against all other bettors, and the track is assured of making its "takeout" regardless of which horse wins. Because the pari-mutuel system does not calculate the final payout that will be made to the winning bettor until all of the bets have been made, the posted odds at the time you made your bet are not the odds that you may wind up with for your bet. The posted odds can change significantly right up to "off time" as money arrives. Although all bets are required to have been made prior to the start of the race (when the starting gate opens and the bell sounds), the final odds can change after the gate opens because bets made immediately prior to the start of the race are still being processed.

**B.     Types of Pari-mutuel Wagering Pools in Horse Racing**

36.     There are many types of bets that can be made at the horse track in addition to the simple win bet described above. The following chart describes some of the most common bets that can be made at the horse track:

| Pool | What you pick | How you win |
|------|---------------|-------------|
| Win | 1 horse to finish 1st | Your horse wins the race |
| Place | 1 horse to finish 1st or 2nd | Your horse finishes 1st of 2nd |
| Show | 1 horse to finish 1st, 2nd, or 3rd | Your horse finishes 1st, 2nd, or 3rd |
| Exacta | 1st and 2nd finishers in exact order | Both horses finish 1st and 2nd, in order |
| Trifecta | 1st, 2nd, and 3rd in exact order | All three finishers in exact order |
| Superfecta | 1st, 2nd, 3rd and 4th in exact order | All four finishers in exact order |

| Pool | What you pick | How you win |
|------|---------------|-------------|
| **Daily Double** | Winners of two consecutive races | You have the winner of two consecutive races |
| **Pick 3** | Winners of three consecutive races | You have all three winners |
| **Pick 5** | Winners of five consecutive races | You have all five winners |
| **Pick 6** | Winners of six consecutive races | You have all six winners |

37.     The track operates a separate pari-mutuel pool for each one of these types of wagers, and each pool is separate from each of the other betting pools. The same logic in calculating payoff to winning bettors described above with respect to the win bet also applies to each of the other pools.

38.     When a consumer opens an account on live to place a bet, he/she is presented with the location of the track, the horses running and the odds. At the time a bet is placed, there is no disclosure that these are not true odds as a result of the insider betting scheme and related particulars described herein. But the odds presented to an average bettor like plaintiff and members of the proposed class  not the real odds as presented  as those odds  are materially changed by the rigging scheme.

39.     So, when a bettor gets online, they shall see the odds, as depicted below:

011348-11/3331884 V3



The average better has no way of knowing that the Insider Betting Groups' actions will manipulate these odds against their bet.

## C.    Advance Deposit Wagering

40.    Prior to the late 1990s, all pari-mutuel bets into a racetrack's pools had to be made with cash, in-person at either the racetrack or at a state licensed Off-Track Betting facility ("OTB"). The lack of technology at the time made betting slow and cumbersome. The systems at the racetrack could not accommodate a bettor going to the window to make a bet in the denomination of his choice. Instead, there were separate windows (and resulting queues) for $2.00, $5.00, $10.00, $50.00 and $100.00 bets. If you wanted to make a $2,000.00 bet, you had to wait in the $100.00 bet line and make 20 bets of $100.00 each.

-11-

41.    In the late 1990s and early 2000s, computer technology had improved to the point where telephone betting became feasible. Pursuant to the federal Interstate Horseracing Act of 1978 and its 2000 amendment (which clarified that interstate wagers could be placed by telephone or electronic media), numerous companies established Advance Deposit Wagering ("ADW") platforms to make wagering on horse racing easier and quicker.

42.    An ADW is a licensed, account-based service that lets a bettor fund an account in advance and bet into racetracks' pari-mutuel pools remotely, first through telephones and later primarily through the internet. Wagers made in an ADW account are routed to the host track's tote and commingled with on-track bets into the racetrack's pari-mutuel pools.

**D.    Computer-Assisted Wagering Teams**

43.    Computer-assisted wagering ("CAW") is high-volume pari-mutuel betting done by professional teams using models, direct tote connections, and automation to fire thousands of highly targeted bets—often in the final seconds before pools close. These groups ingest real-time prices and data, compute fair odds across many pools, and submit "batch" bets when the public price diverges from their model. They typically receive lower fees and rebates from tracks/ADWs, and in some jurisdictions have privileged connections for faster bet placement.

44.    Large, well-funded betting syndicates using custom models, fast data, direct tote connections, and big rebates to fire huge bets - often right before the bell. They're now a significant share of the total amount bet (the "Handle") at major U.S. tracks.

45.    CAW began in the 1980s-1990s with algorithmic syndicates demonstrating that computer models could beat public pricing errors in large pari-mutuel pools, famously at the

Hong Kong Jockey Club.[4] By the mid-1990s – 2000s, high-volume play began attracting rebates through Racing and Gaming Services ("RGS") and other "rebate shops" leveraging lower fees and the ability to make late batched bet submissions.[5] By 2023, the Insider Betting Group share of all wagers placed at U.S. racetracks soared from just 8% in 2003 to approximately 33% in 2023.[6]

46.    There are three CAW platforms that service all, or the vast majority of Members of the Insider Betting Group: Elite Turf Club, Velocity and Racing and Gaming Services ("RGS").

### 1.    Elite Turf Club

47.    Elite Turf Club ("Elite") is licensed in Curacao and in the United States in North Dakota. Elite is the dominant CAW platform in the U.S. Elite is owned 80% by Stronach and 20% by the NYRA.[7] Elite has a small number of active accounts (approximately 17), but those accounts comprise a large proportion of the total amounts wagered in the U.S.

### 2.    Velocity Wagering

48.    Velocity Wagering ("Velocity") is a high-volume, computer-assisted wagering CAW / rebate-style platform used by a small number of professional teams to bet into U.S. pari-

---

[4] Michael Kaplan, The High Tech Trifecta, Wired Magazine (Mar. 1, 2002), https://www.wired.com/2002/03/betting/.

[5] Tom LaMarra, Jury Out on Rebates, Computer Bets, BloodHorse (Jan. 25, 2008), https://www.bloodhorse.com/horse-racing/articles/155904/jury-out-on-rebates-computer-bets.

[6] Sue Finley, *Technology, Engagement, and the Future the Focus of Annual Round Table Conference*, Thoroughbred Daily News (August 3, 2023), https://www.thoroughbreddailynews.com/technology-engagement-and-the-future-the-focus-of-annual-round-table-conference/.

[7] https://www.chrb.ca.gov/misc_docs/Computer_Assisted_Wagering.pdf.

mutuel pools. Velocity is owned by Defendant Churchill Downs. Velocity concentrates on Churchill Downs-managed racetracks, while Elite carries much of the CAW play in California.[8]

### 3.    Racing & Gaming Services (RGS)

49.    Racing & Gaming Services (RGS) is a CAW based in St. Kitts and Nevis that operates exclusively in pari-mutuel wagering.

### E.    The Role of AmTote and Totalizator Service Providers

50.    Defendant AmTote is the dominant totalizator service provider for racetracks in North America. AmTote's infrastructure is the clearinghouse of U.S. pari-mutuel wagering — essentially operating the wagering pools for every racetrack, including using the wires and mails in:

- Receiving wagers from thousands of terminals and ADWs;
- Routing the wagers to the correct pools;
- Calculating odds in real time based upon the betting in each pool;
- Locking pools at "stop-bet" (off time);
- Determining final payouts; and
- Generating audit trails and race reports.

51.    The AmTote system acts as the middleman between bettors (on-track, ADW or CAWs) and each racetrack's pools.

52.    For example, a bettor places a $5.00 wager in his ADW account over the internet on the #5 horse in the 3rd race at Santa Anita. The ADW sends a message to AmTote identifying the wager type, amount, pool, race number, track code, and time stamp.

---

[8] Byron King, *Balance Between CAW, Retail Market Sought in California*, BloodHorse (June 21, 2024), https://www.bloodhorse.com/horse-racing/articles/277723/balance-between-caw-retail-market-sought-in-california.

53.     AmTote checks that the race is still open and that the bet is a valid type, amount and horse or horses. If valid, AmTote confirms acceptance and records the wager. The bet then is assimilated into the track's wagering pool.

54.     AmTote then updates the pool totals and recalculates odds for each pool approximately every 1-2 seconds. These updates are distributed to tracks and ADWs via AmTote's "data broadcast feed."

55.     The instant the gate opens and the bell sounds, the track signals "stop bet," and AmTote is required to lock the pool so that no new wagers should enter the pools. Any remaining pending tickets are required to be "shut out" and rejected by AmTote. CAW systems that can transmit in the final seconds benefit from minimal latency in AmTote's connection.

56.     When official results are declared, AmTote computes winning combinations and payoff amounts. Each winning ticket can then be redeemed electronically through the ADW or CAW or on site at the racetrack. Reports are generated by AmTote for stewards, regulators, and auditors.

57.     AmTote reconciles every transaction, generates settlement reports, and credits funds to: a) Host tracks; b) Simulcast partners; and c) ADWs and CAWs (net of takeout, fees, and rebates). All data are stored in redundant data centers and subject to state racing commission audit. However, real-time transparency is limited—the public only sees odds snapshots, not the flow or identity of bettors.

**F.     How AmTote Interacts with Insider Betting Group**

58.     Insider Betting Group such as Elite Turf Club connect directly via the wires and mails to the AmTote totalizator system through dedicated, low-latency links. This gives the Insider Betting Group: Real-time access to pool data, odds, and probables; The ability to submit

*thousands of bets per second*; Priority processing queues; and Immediate confirmation of acceptance or rejection.

59.    Because CAW algorithms monitor pools in real time, they can: Detect overlays (horses or combinations temporarily underbet); Fire massive batches of bets in the final seconds before the pool closes; and Exploit small inefficiencies across interlinked pools (e.g., in Exactas or Pick-4s).

**G.    Reasons for the Rise in CAW Betting**

60.    A small set of members of the Insider Betting Group currently account for about one-third of all U.S. betting on horse racing.

61.    Racetracks face pressure to keep big bettors active to hit purse targets and maintain race programs.

62.    Members of the Insider Betting Group are incentivized to make more bets by tracks giving them significant rebates of the takeout percentages. Although these rebates lower the percentage takeout paid to tracks, the sheer volume of the CAW play makes it advantageous to the racetracks because it is a significant amount of additional revenue (albeit it at lower margins).

63.    Additionally, the Stronach Group, Churchill Downs and NYRA own or co-own CAW platforms Elite and Velocity. Additional Insider Betting Group play leads to increased revenues for these subsidiaries as well.

**V.    THE ILLICIT SCHEME: INSIDER BETTING GROUP ADVANTAGES**

64.    Stronach uses this position to direct API-level access and speed advantages produce practical inequality compared to ordinary bettors who go through slower retail or web interfaces.

65.    Members of the Insider Betting Group by design have significant advantages that the public does not, including the following:

**A.    Pricing: The Insider Betting Group Far Lower "Effective Takeout" Allows Them to Profitably Play Strategies Unavailable to Retail Bettors**

66.    Members of the Insider Betting Group receive rebates/low host-fee deals that are unavailable to the public/retail players. This changes the entire nature of the game for the Insider Betting Group, making it extremely profitable to them, while the same betting strategies would bankrupt a retail player.

67.    For example, assuming that the track's takeout is 20% of all retail bets, a CAW might receive a rebate of 13% of that amount, meaning that it's actual or effective takeout rate is just 7%.

68.    Assuming that both the members of the Insider Betting Group and the retail bettor employ the same strategies and bets that yield a 92% win rate, the retail bettor would lose 8%, while the 13% rebate would allow the insiders to enjoy a 5% profit, after the rebate is paid.

69.    Insider Betting Group members negotiate sizable rebates, so they can grind razor-thin edges and still show profits, while the same strategies employed by retail bettors would result in bankruptcy.

70.    Accordingly, these pricing advantages allow the Insider Betting Group to profitably employ strategies that would bankrupt a retail player.

**B.    Speed and Pool Manipulation**

71.    Insider Betting Group members use automated algorithms connected directly to tote systems. They can analyze live odds and place large, split-second wagers in the final seconds before the pool closes—something ordinary players cannot do. This gives them a near-perfect picture of the final odds, allowing them to: i) "Snipe" overlay bets that the public created

earlier, and ii) cause last-second odds drops that destroy value for retail bettors. When a horse

goes from 6-1 to 3-1 after the gate opens, it's usually a CAW batch bet that moved the pool.

**C.      Preferential Access and Execution Quality**

72.      Insider Betting Group members connect by API to the AmTote hub, which can

process up to 2,000 bets/second from a single client a massively higher order throughput than

clicking on an app from an ADW, or making such bets in person at the track.

**D.      Timing/Latency Edge at the Close**

73.      The insiders monitor live odds across pools and dump volume in the final tote

cycles, moving prices sharply right before (and sometimes appearing just after) the break - public

bettors are stuck with worse final odds than they thought.

**E.      Informational Advantage**

74.      The Insider Betting Group members ingest every pool's totals/will-pays

programmatically, scanning for overlays across thousands of combos and firing instantly—

something a human with a phone app can't replicate. The press has long noted Insider Betting

Group's instantaneous knowledge of probable payouts and their ability to wager thousands of

combinations quickly.

75.      With access to cross-pool modeling not available to retail bettors, the insiders can

hedge and diversify across pools/races in ways impractical for retail users — turning what looks

like thin edges into durable profits over massive turnover. (Inference supported by the

pricing/throughput facts above; not a special data privilege.) For example, if the horse that it

likes is a lower price than it desires, the insiders can inspect the other separate, yet related exacta,

trifecta or daily double pools to determine if their horse has greater value in those pools and bet

accordingly. Indeed, former NYRA CEO Charles Hayward described members of the Insider

Betting Group having **direct access to the host tote pool**, letting them *scan pools and compare*

-18-

*values* and then **dump thousands of bets in the final minute(s)**—crucial for exploiting cross-pool signals before the bell.[9]

F.    **Risk Management Across Pools**

76.    With automation and rebates, the members of the Insider Betting Group can spread risk widely in different pools (verticals/horizontals) and still profit on thin overlays—an approach that cannot be duplicated by retail bettors.

77.    The net effect of all of these advantages allows the Insider Betting Group members to enjoy cheaper prices, faster execution, better information, and scale—advantages that compound in a pari-mutuel system, where one side's edge directly reduces the other's. The insiders do not just enjoy higher margins but are playing an entirely different game to the detriment of retail players. As described by the Thoroughbred Idea Foundation:

> In Wall Street's case, increased trading volumes brought wealth to a wide spectrum of stakeholders. In racing, it has brought a redistribution of wealth away from the vast majority of horseplayers and horse owners, and into the hands of some select racetrack corporations and their technological arms.[10]

VI.    **DEFENDANTS' CONTROL OVER PARI-MUTUEL BETTING POOLS**

78.    As described above, the Defendants own various entities allowing them to exercise complete control over the betting pools at racetracks. Stronach/1st Technology, through various subsidiaries or operating groups owns a totalizator company (AmTote), various ADW platforms (XPressbet, 1/st Bet), rights and signal distribution (1/st Content), numerous racetracks

---

[9] Charles Hayward, *To Ensure the Future of the U.S. Racing Industry, The Betting Business Has to Change*, Thoroughbredracing.com (Jan. 26, 2021), https://www.thoroughbredracing .com/articles/4893/ensure-future-us-racing-industry-betting-business-has-change/.

[10] Racing Not Only for [the] Elite, Thoroughbred Idea Foundation (July 2020), p. 3, https://racingthinktank.com/application/files/5716/0400/0351/TIF_Reports_-_July_2020_- _Racing_Not_Only_For_The_Elite.pdf.

(Santa Anita, Gulfstream, Laurel Park); and a CAW platform (80% of Elite). Likewise, Defendant Churchill Downs owns a totalizator company (United Tote), an ADW platform (TwinSpires), racetracks (Churchill Downs, Turfway Park, the Fair Grounds, Colonial Downs, etc.) and a CAW platform (Velocity). NYRA similarly owns 40% of United Tote, popular racetracks Saratoga, Belmont and Aqueduct, ADW platform NYRA Bets and 20% of CAW platform Elite. This ownership of all aspects of betting on horse races allows them to exercise control over the betting pools.

## A.  Host Racetracks Set Pricing and Access Rules

79.    As described above, the Defendants own numerous racetracks. This is important because the host track (e.g. Santa Anita for a Santa Anita race) sets takeout, host fees, available bet types, and who may play (including CAW rules). These are policy choices the host makes—and ADWs and totalizator companies enforce.

80.    As Defendant Elite explained in a letter to the California Horse Racing Board, the racetrack owners control whether Insider Betting Group can participate in the betting pools and under what rules:

> Racetrack operators play an important role in regulating Elite's activities by determining an acceptable ratio of CAW play to retail play and adjusting host fees paid by Elite players (which incentivizes more/less wagering) to achieve the desired balance.[11]

Of course, a racetrack that also owns the CAW platform has every incentive to allow permissive CAW rules regardless of their impact on the public.

---

[11] Letter from Elite Turf Club, LLC to the California Horse Racing Board (Sep. 5, 2024), p. 7, https://www.chrb.ca.gov/misc_docs/Computer_Assisted_Wagering.pdf.

**B.    Tote Companies Run the "Plumbing" of the Pools**

81.    Defendants AmTote (Stronach/1/ST) and United Tote (Churchill Downs/NYRA) operate the host and guest hubs that merge all bets, and they control the "stop betting" signal over ITSP (the inter-tote protocol). That's why a host can simultaneously cut off pools everywhere—and why these firms' logs are the system of record for exactly when bets hit. Owning the tote means owning the operational layer that gates, timestamps, and settles the pools.

**C.    Content /Rights Arms Steer Where Handle Flows**

82.    Stronach/1/ST's Monarch/1/ST CONTENT, and similar entities or divisions within Churchill Downs and NYRA decide who gets the racetrack signals and on what terms; that leverage has been used in carriage disputes and distribution deals, which directly affects where bettors can access those pools and how much money shows up in them.[12]

**D.    The ADW Platforms Control Consumer Wagering**

83.    Defendants' ADW platforms (Stronach's Xpressbet and 1/st Bet; Churchill Downs's TwinSpires and NYRA's NYRA Bets) are the main consumer funnels into the racetrack betting pools. They implement the host track policies regarding betting, display odds, video and other parameters.

**E.    Defendants' CAW Platforms**

84.    Defendants Elite (80% Stronach, 20% NYRA), Velocity (Churchill Downs) and RGS are purpose-built hubs for high-volume teams of horse racing bettors, as described by an article in the Guardian:

---

[12] Dan Ross, *Multiple Moving Parts in Monarch, AZ Simulcasting Morass*, Thoroughbred Daily News (Aug. 25, 2022), https://www.thoroughbreddailynews.com/multiple-moving-parts-in-monarch-az-simulcasting-morass/. *See also*, Matt Hegerty, *Golden State Racing, Monarch Reach Deal to End Simulcasting Blackout*, Daily Racing Form (Oct. 23, 2024), https://www.drf.com/news/golden-state-racing-monarch-reach-deal-end-simulcasting-blackout.

Computer-assisted wagering (CAW) in thoroughbred racing uses algorithms and software to analyze vast data sets on horses, jockeys and races to make highly calculated bets, often placed by large teams or syndicates. CAW can predict odds fluctuations and identify betting inefficiencies, enabling large-scale, automated betting across multiple races and tracks. These systems often place wagers in real-time, sometimes only seconds before a race begins, putting the everyday punters who largely fund the betting pools at a disadvantage.[13]

85.    The THOROUGHBRED DAILY NEWS identified the "potentially lopsided ramifications" of the deals made between Insider Betting Group members and racetracks, noting that "[a]t the enormous volumes CAW gamblers play, such deals can give individual players a significant financial edge."[14]

86.    THE GUARDIAN described these types of deals as parasitic:

Tracks like Del Mar serve up their retail customers, everyday bettors, to computer-assisted wagering (CAW) teams who use the wagering pools those customers create like a parasite does a host, and who work based off big figure deals with the tracks. Industry heavyweights like The Stronach Group, New York Racing Association, and Churchill Downs own the platforms these teams use to gamble on.[15]

## VII.    DEFENDANTS HAVE INCENTIVES TO PERMIT INSIDER BETTING GROUP TO EXPLOIT THE BETTING POOLS

87.    Defendants each have strong incentives to engage in the Insider Betting Group scheme, including increasing handle (amount bet) at racetracks, which is subject to a "takeout"

---

[13] Elizabeth Banicki, *How Computer-Assisted Wagering Became Horse Racing's Insider Trading*, The Guardian (Nov. 1, 2024), https://www.theguardian.com/sport/2024/nov/01/computer-assisted-wagering-horse-racing-controversy.

[14] Dan Ross, *Computer Assisted Wagering: Anatomy of a Deal*, Thoroughbred Daily News (March 20, 2024), https://www.thoroughbreddailynews.com/computer-assisted-wagering-anatomy-of-a-deal/.

[15] Elizabeth Banicki, *How Computer-Assisted Wagering Became Horse Racing's Insider Trading*, The Guardian (Nov. 1, 2024), https://www.theguardian.com/sport/2024/nov/01/computer-assisted-wagering-horse-racing-controversy.

by the track for the benefit of the owner. Additionally, the Defendants' subsidiary businesses all make increased profits based upon a higher volume of betting.

88.    Defendant Stronach/1/ST benefits from increased betting handle at its racetracks that is subject to takeout. Even though the rebates paid to Insider Betting Group members are lower-margin than additional handle from Class Member betting, they nonetheless increase Stronach's revenues. The volume of bets made by the insiders also yields additional revenues to Stronach from Elite and additional processing fees for AmTote.

89.    Defendant NYRA benefits from additional wages by the insiders from increased betting handle at its racetracks that is subject to takeout. Even though the rebates paid to insiders are lower margin than additional handle from Class Member betting, they nonetheless increase revenues from racetrack ownership. Additional insider betting volume also increases revenues paid to Elite (20% owned by NYRA) and additional processing fees for United Tote (49% owned by NYRA).

90.    Defendant Churchill Downs benefits from additional wagers by the Insider Betting Group from increased betting handle at its racetracks that is subject to takeout. Even though the rebates paid to the insiders are lower-margin than additional handle from Class Member betting, they nonetheless increase revenues from owning the racetracks. Additional insider betting volume also increases revenues paid to Elite (20% owned by NYRA) and additional processing fees for United Tote (49% owned by NYRA).

## VIII.   CLASS ACTION ALLEGATIONS

91.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3) on behalf of themselves, their members, and the following individuals (the "Class"):

> All persons in the United States who placed wagers into CAW-Impacted horse race betting Pools on Thoroughbred horse races while not using a CAW account.

92.    Plaintiff reserves the right to expand, narrow, or otherwise modify or refine the definition of the Class based on additional information obtained through further investigation and discovery, and/or in order to address or accommodate any of the Court's manageability concerns.

93.    Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiff and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

94.    **Ascertainability.** The proposed Class is readily ascertainable because it is defined using objective criteria, so as to allow class members to determine if they are part of the Class. Further, the members of the class can be readily identified through records and information in Defendants' possession, custody, or control.

95.    **Numerosity.** The Class is so numerous that joinder of individual members is impracticable. While the exact number of members of the Class is not known to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands or millions of class members.

96.    **Commonality and Predominance.** Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Class, including the following:

a.      Whether Defendants violated RICO;

b.      Whether Defendants engaged in the conduct alleged herein;

c.      Whether Defendants are liable under RICO;

d.      Whether there is an enterprise within the meaning of RICO;

e.      Whether Defendants participated in the enterprise;

f.      Whether Plaintiff and the other Class members are entitled to damages and other monetary relief and, if so, in what amount; and

g.      Whether Defendants violated applicable state laws.

97.     **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff, and members of the Class sustained damages arising out of Defendants' common course of conduct as described in this Complaint. The injuries of Plaintiff, and each member of the Class were directly caused by Defendants' wrongful conduct, and Plaintiff and members of the Class assert similar claims for relief.

98.     **Adequacy.** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest that is antagonistic to those of the Class, and Defendants have no known defenses unique to Plaintiff. Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor Plaintiff's counsel has any interest adverse to those of the other members of the Class.

99.     **Substantial Benefits.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. This proposed class

action is manageable. Plaintiff knows of no special difficulty to be encountered in the maintenance of the action that would preclude its maintenance as a class action.

## COUNT I:

### VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) 18 U.S.C. § 1962(C), (D) (AGAINST ALL DEFENDANTS)

100.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is alleged against all Defendants.

101.    Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

102.    All Defendants are "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

103.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate."

104.    During the Class Period, each of the Defendants participated in the affairs of an illegal enterprise (the "Pool Rigging Enterprise"), whose purpose it was to conduct an illegal gaming business and to manipulate the betting pools of horse racing tracks throughout the United States in order to allow Computer Assisted Wagering teams to profit at the expense of Plaintiff and the other Class members.

### 1.    The Members of the Pool Rigging Enterprise

105.    The members of the Pool Rigging Enterprise are all Defendants.

106.    Allowing the Insider Betting Group to manipulate the betting pools to extract illicit profits that rightfully belonged to Class Members benefited the enterprise in several ways.

107.    The Stronach Group, Inc. had and has substantial control over (and participated in) the affairs of the Pool Rigging Enterprise by:

    a.    Controlling the host tracks which set takeout, host fees, available bet types and rules governing what bets and when can be made by the Insider Betting Group;

    b.    Controlling Defendant AmTote, which operates the host and guest hubs that merge all bets in the pools and gates, timestamps and settles all bets in the pools;

    c.    Controlling the content rights for who can see racetrack signals and on what terms through its 1/ST Monarch, 1/ST Content and other divisions or subsidiaries controlling content rights;

    d.    Controlling the Xpressbet and 1/ST Bet ADW platforms, which control the majority of bets made by Class Members; and

    e.    Controlling Elite, the most prominent CAW platform.

108.    Stronach Group Services, LLC had and has substantial control over (and participated in) the affairs of the Pool Rigging Enterprise by:

    a.    Controlling the host tracks which set takeout, host fees, available bet types and rules governing what bets and when can be made by the Insider Betting Group;

    b.    Controlling Defendant AmTote, which operates the host and guest hubs that merge all bets in the pools and gates, timestamps and settles all bets in the pools;

    c.    Controlling the content rights for who can see racetrack signals and on what terms through its 1/ST Monarch, 1/ST Content and other divisions or subsidiaries controlling content rights;

    d.    Controlling the Xpressbet and 1/ST Bet ADW platforms, which control a significant portion of bets made by Class Members; and

    e.    Controlling Elite, the most prominent CAW platform.

011348-11/3331884 V3

109.     Churchill Downs, Inc. had and has substantial control over (and participated in) the affairs of the Pool Rigging Enterprise by:

    a.    Controlling the host tracks which set takeout, host fees, available bet types and rules governing what bets and when can be made by the Insider Betting Group;

    b.    Controlling United Tote, which operates the host and guest hubs that merge all bets in the pools and gates, timestamps and settles all bets in the pools;

    c.    Controlling the content rights for who can see racetrack signals from tracks it controls and on what terms;

    d.    Controlling the TwinSpires ADW platform, which controls a significant portion of bets made by Class Members; and

    e.    Controlling Velocity, a prominent CAW platform.

110.     NYRA had and has substantial control over (and participated in) the affairs of the Pool Rigging Enterprise by:

    a.    Controlling host tracks including Saratoga, Belmont and Aqueduct, which set takeout, host fees, available bet types and rules governing what bets and when can be made by the Insider Betting Group;

    b.    Minority ownership of United Tote, which operates the host and guest hubs that merge all bets in the pools and gates, timestamps and settles all bets in the pools;

    c.    Controlling the content rights for who can see racetrack signals from tracks it controls and on what terms;

    d.    Controlling the NYRA Bets ADW platform, which controls a significant portion of bets made by Class Members; and

    e.    Partial ownership of Elite, the most prominent CAW platform.

111.     AmTote had and has substantial control over (and participated in) the affairs of the Pool Rigging Enterprise by:

    a.    Operating the host and guest hubs that merge all bets in the pools and gates, timestamps and settles all bets in the pools;

-28-

112.    United Tote had and has substantial control over (and participated in) the affairs of the Pool Rigging Enterprise by:

      a.    Operating the host and guest hubs that merge all bets in the pools and gates, timestamps and settles all bets in the pools;

113.    Elite had and has substantial control over (and participated in) the affairs of the Pool Rigging Enterprise by:

      a.    Allowing members of the Insider Betting Group unfair and preferential advantages into the betting pools at racetracks, including rebates; speed and pool manipulation; preferential access and execution quality; timing and latency edge at the close of betting and informational advantages.

114.    RGS had and has substantial control over (and participated in) the affairs of the Pool Rigging Enterprise by:

      a.    Allowing members of the Insider Betting Group unfair and preferential advantages into the betting pools at racetracks, including rebates; speed and pool manipulation; preferential access and execution quality; timing and latency edge at the close of betting and informational advantages.

115.    All members of the Pool Rigging Enterprise directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present because such information lies in Defendants' and others' hands.

116.    All members of the Pool Rigging Enterprise served the common purpose of allowing the Insider Betting Group members special and preferential access to the betting pools in order to divert money from Class Members to the Insider Betting Group members.

117.    Each member of the Pool Rigging Enterprise shared in the proceeds obtained through manipulation of the betting pools.

118.    For example, Defendant Stronach benefits from increased betting handle at its racetracks that is subject to takeout. Even though the rebates paid to insiders are lower-margin

than additional handle from Class Member betting, they nonetheless increase Stronach's revenues. The volume of the Insider Betting Group also yields additional revenues to Stronach from Elite and additional processing fees for AmTote.

119.    Likewise, Defendant NYRA benefits from additional Insider Betting Group wagers from increased betting handle at its racetracks that is subject to takeout. Even though the rebates paid to insiders are lower margin than additional handle from Class Member betting, they nonetheless increase revenues from racetrack ownership. Additional insiders betting volume also increases revenues paid to Elite (20% owned by NYRA) and additional processing fees for United Tote (49% owned by NYRA).

120.    Further, Defendant Churchill Downs benefits from additional Insider Betting Group wagers from increased betting handle at its racetracks that is subject to takeout. Even though the rebates paid to insiders are lower-margin than additional handle from Class Member betting, they nonetheless increase revenues from owning the racetracks. Additional insider betting volume also increases revenues paid to Elite (20% owned by NYRA) and additional processing fees for United Tote (49% owned by NYRA).

121.    AmTote benefits from the scheme by increased revenues due to larger volume through its processing facilities.

122.    United Tote benefits from the scheme by increased revenues due to larger volume through its processing facilities

123.    Defendant Elite benefits from the scheme because additional insider betting volume also increases revenues paid to Elite.

124.    Defendant RGS benefits from the scheme because additional insider betting volume also increases revenues paid to RGS.

### 2.    The Predicate Acts

125.    To carry out or attempt to carry out the scheme to defraud, the members of the Pool Rigging Enterprise conducted or participated in the conduct of the affairs of that enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud). The members of the Pool Rigging Enterprise also conducted or participated in the conduct of the affairs of that enterprise through a pattern of racketeering activity that had the effect of manipulating and corrupting the wagering outcomes of otherwise legitimate horse racing wagering pools, thereby transforming those pools and the illicit bets transferred into those pools by the Pool Rigging Enterprise into something other than, and distinctive and apart from, the form of pari-mutuel horse betting that is otherwise authorized under State law by the respective States in which horse racing is conducted, in a repeated and continuing violation of the provisions of 18 U.S.C. § 1955 (conduct of an illegal gambling business).

126.    Specifically, the members of the Pool Rigging Enterprise participated in the scheme to defraud by using mail, telephone, and the internet to transmit illicit bets made into the wagering pools of racetracks by the Defendant Insider Betting Group, as demonstrated in the following chart:

011348-11/3331884 V3



127. The Pool Rigging Enterprise members utilized interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and pool manipulation techniques described therein.

128. The Pool Rigging Enterprise members also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other entities in furtherance of the scheme.

129. The mail and wire transmissions described herein were made in furtherance of the Pool Rigging Enterprise members' scheme and common course of conduct to deceive regulators

and consumers and allow the Insider Betting Group members to manipulate the betting pools in order to take unjust profits from the betting pools.

130.    Many of the precise dates of the fraudulent uses of U.S. Mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the Pool Rigging Enterprise members' or the Totalizer Defendants' books and records. Plaintiff has described the types of the predicate acts of mail and/or wire fraud that occurred. They include thousands of communications to perpetuate and maintain the scheme, including the activities described in the preceding paragraphs.

131.    The Pool Rigging Enterprise members have not undertaken the practices described herein in isolation but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the Pool Rigging Enterprise members conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the Pool Rigging Enterprise members in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, track handle increase market share, and/or minimize losses for the Pool Rigging Enterprise members and their unnamed co-conspirators both in conducting an illegal gambling business and throughout the illegal scheme and common course of conduct.

132.    The Pool Rigging Enterprise members aided and abetted others in the violations of all the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

133.    The Pool Rigging Enterprise members, with knowledge and intent, have agreed to the overall objectives of the Pool Rigging Enterprise and participated in the common course of

conduct to conduct an illegal gambling business and to commit acts of fraud and indecency in allowing the Insider Betting Group to manipulate the betting pools and extract illicit profits to the detriment of the Class.

134.    The Pool Rigging Enterprise members' conduct in furtherance of its illegal gambling business and this scheme was intentional. Plaintiff and the Class Members were harmed as a result of the Pool Rigging Enterprise members' intentional conduct.

135.    As described herein, the Pool Rigging Enterprise members engaged in a pattern of related and continuous predicate acts for many years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiff and other Class Members and obtaining significant monies and revenues from them. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

136.    The predicate acts all had the purpose of generating significant revenue and profits for the Pool Rigging Enterprise members at the expense of Plaintiff and the other Class members. The predicate acts were committed or caused to be committed by the Pool Rigging Enterprise members through their participation in the Pool Rigging Enterprise and in furtherance of its fraudulent scheme.

137.    The Pool Rigging Enterprise members' violations of 18 U.S.C. § 1962(c) and (d), and 18 U.S.C. § 1955, have directly and proximately caused injuries and damages to Plaintiff and Class Members, all of whom are entitled to bring this action for three times their actual damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c). Each member of the Pool Rigging Enterprise knew, understood, and intended for Insider Betting Group members to manipulate the betting pools in order to extract illicit profits for each of the Pool Rigging

Enterprise members. As a result of the conduct of the Enterprise, Plaintiff and the Class were cheated and deprived of wagering proceeds that were rightfully theirs.

## IX.    INJURY TO THE CLASS AS A RESULT OF THE OPERATION OF THE POOL RIGGING ENTERPRISE

138.    As described herein, the improper and illegal advantages given to the Insider Betting Group members by the Defendants allow them to realize excessive and improper gains. A pari-mutuel pool, like the stock market, is a zero-sum proposition—if one person gets an improper gain, it comes at the expense of another. Here, every dollar that the insiders illicitly take from the pools is money that rightfully should have been distributed to Class Members.

139.    The damages to Class Members stem from the systemic advantages given by the Defendants to their insider betting partners, including:

a.    **Rebates**. The members of the Insider Betting Group get extensive rebates from the takeout rates that Class Members must pay, which cuts their effective takeout far below that of Class Members. As the Thoroughbred Idea Foundation explains, the betting pools in horse racing have "two types of customers, those who get rebates and those who do not," and that this imbalance raises the effective cost for Class Members.[16]

b.    **Late Odds Drops**. Insider Betting Members bet in big batches during the last pricing cycle before the race starts. Because tote systems take 13-17 seconds to finish merging and display final odds, prices often change after the race starts – the odds at zero minutes to post wasn't the closing price that ends up being paid to winning bettors. That whipsaws retail players and removes previously visible overlays.

c.    **Insider Betting Group Concentrate in Exotics Pools**. Independent analysis of NYRA pools shows late-cycle money increasing sharply — especially in exactas, trifectas and superfectas —consistent with heavy insider betting participation (where posted takeout is higher and modeling advantages compound).[17] The Thoroughbred Idea Foundation argues that focusing only on win-pool tweaks is "window dressing" because the bulk

---

[16] https://racingthinktank.com/blog/takeout-201-rebating.

[17] Dan Ross, *Gramm-McKinney Study Shows Late CAW Activity in NY Pools is Growing*, Thoroughbred Daily News (June 11, 2025), https://www.thoroughbreddailynews.com/gramm-mckinney-study-shows-late-caw-activity-in-ny-pools-is-growing/.

011348-11/3331884 V3

of CAW betting (and harm to the Class) results from insider betting participation in the exotics (exacta, trifecta and superfecta) pools.[18]

d.   **Illicit Winnings are Taken from Rightful Owners**. The nature of pari-mutuel wagering is that the losers pay the winners. Because members of the Insider Betting Group are using unfair advantage, they illicitly make profits that instead should have been allocated to Class Members.

## A.   Elite Admits It Damages Class Members

140.   In a letter to the California Horse Racing Board, Defendant Elite admitted that allowing Elite players to wager into the pools at California racetracks increases the effective takeout for retail players by two and a half percent (2.50%).[19] Elite walked the California regulator through its calculation based upon just 20% of the pool being CAW money winning at a higher rate. In reality, the Insider Betting Group have become significantly larger than 20% of the pool, thus Elite's damage model significantly understates the damages caused to the Class by Elite's misconduct.

## B.   NYRA's and Stronach's Restrictions Admit the Insider Betting Group Damages Class Members

141.   Facing significant public pressure, Defendants Stronach and NYRA have instituted partial bans on CAW betting in certain pools. For example, in 2021, NYRA announced that CAW win wagers must be placed more than 3 minutes before the start of a race. In 2025, Stronach's Santa Anita track announced a similar restriction on CAW bets made less than 2 minutes before post time.

142.   In addition, Defendant NYRA has excluded Insider Betting Group from certain of its betting pools. Specifically, NYRA excludes members of the Insider Betting Group from the

---

[18] *TIF Reports: Sharks & Minnows*, Thoroughbred Idea Foundation (June 19, 2023), https://racingthinktank.com/reports/sharks-minnows.

[19] Letter from Elite Turf Club, LLC to the California Horse Racing Board (Sep. 5, 2024), pp. 6-7, https://www.chrb.ca.gov/misc_docs/Computer_Assisted_Wagering.pdf.

late Pick-5 bets (the last five races of the card), although they may participate in the early Pick-5 wager (the first five races of the card).

143.    Although these restrictions serve to lessen the impact of Insider Betting Group in these particular betting pools, they do nothing to prevent abuse of Class Members in the other pools. Further, they serve as an admission by Defendants Stronach and Churchill Downs that the Insider Betting Group members are victimizing Class Members in the other betting pools.

### COUNT II:

### CONVERSION
### (AGAINST ALL DEFENDANTS)

144.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is alleged against all Defendants.

145.    Plaintiff and Class Members owned or had the immediate right to possess (a) specific, identifiable funds in their wagering accounts earmarked for particular bets and payouts, and/or (b) wagering tickets/credits and resulting payout proceeds.

146.    Defendants intentionally exercised dominion and control over those specific funds, tickets, and payout proceeds by (a) accepting/processing privileged batch wagers that diluted and re-priced pools at or after stated cut-off, (b) withholding, misdirecting, or re-allocating monies impressed with a specific purpose (pari-mutuel payout), and/or (c) refusing to return or remit the proper proceeds upon demand.

147.    Such control seriously interfered with Plaintiff's rights and was inconsistent with their ownership and possessory interests.

148.    Plaintiff and the Class suffered damages including the fair value of converted funds at the time and place of conversion, prejudgment interest, and consequential losses.

## COUNT III:

### UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

149.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is alleged against all Defendants.

150.    Defendants received and retained monetary benefits (takeout, rebates, breakage, fees, spreads, and profits) derived from the challenged scheme and from monies paid by Plaintiff and the Class.

151.    It would be unjust for Defendants to retain these benefits obtained through concealment of privileged access/timing, misrepresentations/omissions about pool integrity, and unfair processing practices.

152.    Equity requires restitution and disgorgement to Plaintiff and the Class, the imposition of a constructive trust over ill-gotten gains, and an accounting.

## COUNT IV:

### CONSPIRACY
### (AGAINST ALL DEFENDANTS)

153.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is alleged against all Defendants.

154.    By virtue of the conduct alleged herein, Defendants formed and operated a conspiracy and committed wrongful act or acts done pursuant to this conspiracy, which caused damage to Plaintiff and the Class.

155.    Under the common law of each State for which claims are alleged in Counts II and III, Plaintiff alleges on information and belief that Defendants knowingly and intentionally conspired to engage in the wrongful conduct alleged in each Count under State law set forth

## PRAYER FOR RELIEF

WHEREFORE Plaintiff, on behalf of itself, its members, and members of the Class, seek

monetary and equitable relief, including:

A.      Compensatory damages and treble damages as allowed by law;

B.      A corrective notice program under Fed. R. Civ. P. (b)(23); and

C.      Such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the Class, hereby demands a trial by jury as to all

issues so triable as a matter of right.

Dated: October 24, 2025              **HAGENS BERMAN SOBOL SHAPIRO LLP**

By: /s/ *Anne F. Johnson*
        Anne F. Johnson, 4143392
594 Dean Street, Suite 8
Brooklyn, NY  11231
Telephone: (212) 752-5455
Facsimile:  (917) 210-3980
Email:  annej@hbsslaw.com

Steve W. Berman (*pro hac vice* forthcoming)
Karl P. Barth (*pro hac vice* forthcoming)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
karlb@hbsslaw.com

*Counsel for Plaintiff and the Proposed Class*

011348-11/3331884 V3