# HAGENS BERMAN

**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 SECOND AVENUE, SUITE 2000
SEATTLE, WA 98101

hbsslaw.com

(206) 623-7292 phone     (206) 623-0594 fax

December 29, 2025

Hon. Joan M. Azrack
United States District Judge
U.S. District Court for the Eastern District of New York
100 Federal Plaza, Central Islip, NY 11722

Re:   *Dickey v. Stronach Group, Inc., et al.*, Case No. 2:25-cv-05962

Dear Judge Azrack:

We write this letter pursuant to Section IV(B) of this Court's Individual Rules in response to request to file a motion to dismiss Plaintiff's complaint in the above-referenced action by the Stronach Defendants (ECF No. 34, "Ltr. at __").[1] The central theme of Stronach's letter asserts – wrongly - that Plaintiff bemoans advances in wagering technology. Ltr. at 1. But Plaintiff takes no issue with technological progress; what Plaintiff challenges is Stronach's deliberate use of that technology to confer unfair, concealed advantages on a privileged subset of bettors and to divert money away from ordinary players (Class Members). This case has nothing to do with resisting innovation. It concerns the weaponization of technology to siphon value from the Class and funnel it to members of Stronach-run Elite Turf Club, which, in turn, generate additional revenues for Stronach. Stronach pays lip service to the proposition that bettors are the "financial foundation" of horse racing but participates in looting Class members to benefit their CAW customers.

## I.     STRONACH MISCHARACTERIZES THE COMPLAINT

Stronach ignores the defining reality of pari-mutuel wagering, as set out in detail in the Complaint. ¶¶ 26-35.[2] In fixed-odds sports betting—football, basketball, and the like—a bettor wagers directly against the sportsbook at a stated price. A winning bet harms only the book; no other bettor is touched. ¶ 35. Pari-mutuel wagering is the opposite. It is a pure zero-sum contest among bettors themselves. Every dollar one participant wins is taken directly from the collective pool funded by everyone else. By tilting the playing field in favor of CAW teams, Stronach is siphoning value straight out of the pockets of retail bettors. ¶¶ 64-77. Every preferential advantage granted to CAWs is extracted from the very people the system is supposed to treat equally. Stronach's conduct does not just distort the market; <u>it weaponizes the pari-mutuel structure against ordinary players</u>.[3] Stronach's analogy to a complimentary casino room or a frequent-flyer upgrade is misplaced. In those examples, the hotel or airline provides a benefit paid for out of its own pocket in a direct transaction with its customer. Here, by contrast, the Stronach Defendants are not giving

---

[1] The Stronach Defendants appear to have filed this same letter as ECF No. 33. For simplicity, all defendants are collectively referred to hereinafter as "Stronach."

[2] All citations to "¶ __" are to the Complaint in this action filed on 10/24/25 (ECF No. 1).

[3] The scheme is further elaborated on by news report from *The Guardian* describing the CAWs as parasitic: "Tracks like Del Mar serve up their retail customers, everyday bettors, to computer-assisted wagering (CAW) teams who use the wagering pools those customers create like a parasite does a host . . ." ¶86.

anything of their own. They are conferring financial advantages on their CAW partners using money taken directly from Class members within a pari-mutuel system.

The Complaint alleges with specificity how the CAW scheme harms Class members, including: A) the CAWs' lower effective takeout allows them to play strategies profitably that are unprofitable to retail players and to increase betting on certain strategies that result in them becoming unprofitable to retail players (¶¶ 66-70); B) the CAWs automated algorithms that Stronach allows to be connected directly to the tote systems allows the CAWs to recognize and make last-second "overlay" bets and cause last-second odds drops that harm Class members (¶ 71); C) preferential access and execution allowing CAWs to make a far larger volume of bets than Class members (¶ 72); D) a timing and latency advantage (¶ 73); E) an informational advantage allowing the CAWs to make cross-pool wagers instantaneously and profit on overlays (¶¶ 74-77). These advantages, unavailable to Class members, serve in a pari-mutuel system to improperly divert money from Class members to the CAWs, causing one industry think tank to characterize these advantages as a "redistribution of wealth away from the vast majority of horseplayers and horse owners, and into the hands of some select racetrack corporations and their technological arms." ¶ 77.

## II. PLAINTIFF'S WELL-PLEADED RICO CLAIMS

Stronach incorrectly argues that Plaintiff's RICO claims should be dismissed for failure to identify a RICO enterprise or allege predicate acts. Ltr. at 3. To the contrary, the Complaint alleges each with more than the required particularity.

### A. RICO Enterprise

Allegations of a RICO enterprise are subject to the Rule 8(a) pleading standard. *1567 56th St., LLC v. Spitzer*, 774 F. Supp. 3d 476, 489-90 (E.D.N.Y. 2025). Particularly under this forgiving standard, the Complaint properly alleges the following features of an association-in-fact enterprise: "(1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* (citing *Boyle v. United States*, 556 U.S. 938, 946 129 (2009)). Defendants worked and associated with one another to accomplish the fraudulent scheme of diminishing the value of bets made by retail bettors by providing CAWs with informational, financial, and technical benefits. *Id*; ¶¶ 64-77. The actions of each Defendant are necessary to enact the fraudulent purpose: manipulating the betting pool for the financial benefit of participants by artificially reducing the payouts to retail bettors. ¶¶ 78-86.

### B. Predicate Acts

<u>Mail and Wire Fraud</u>. The Rule 9(b) pleading standard "should not be applied in a manner which would, in effect, obstruct all plaintiffs, including those with valid claims, from initiating civil RICO actions." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998). Defendants' attempted application of Rule 9(b) would do just that. "[I]n cases in which the mail was simply used in furtherance of a master plan to defraud, the mailings need not contain fraudulent information, and a detailed description of the underlying scheme and the connection therewith of the mail and/or

wire communications, is sufficient to satisfy Rule 9(b)." *Aiu Ins. Co. v. Olmecs Med. Supply, Inc.*, No. CV-042934 (ERK), 2005 WL 3710370, at *11 (E.D.N.Y. Feb. 22, 2005). This is distinct from the pleading requirements where Plaintiffs allege that the mail or wire communications were themselves fraudulent, which Defendants seem to apply. *See id*; *Sumitomo Copper*, 995 F. Supp at 456.

Plaintiff alleges a scheme spanning decades, requiring countless phone calls, wire transactions and electronic communications between Defendants to effectuate the fraudulent scheme. *See* ¶¶ 64-86, 125-130. However, the alleged fraud is not based on the content of those communications, instead on their ultimate goal. The Complaint describes this scheme in great detail—complete with a literal diagram of the relationships between Defendants, as well as how they used U.S. Mail and wire system in furtherance of their scheme, in accordance with the appropriate pleading standard. *See Aiu Ins.*, WL 3710370, at *11; ¶¶ 64-86, 125-130.

Section 1955(b). Specific violations of 18 U.S.C. § 1955 arise from the fact that Defendants' scheme does not constitute pari-mutuel wagering. Because their conduct departs from true pari-mutuel betting, it falls outside the scope of state-law exceptions to otherwise applicable gambling prohibitions. *See* Cal. Bus. & Prof. Code §§ 19400 *et seq.*, 19590. Likewise, interstate internet wagering conducted through state-licensed ADWs is permitted pursuant to the Interstate Horse Racing Act 15 U.S.C. § 3001 et seq. only under limited conditions, including that the wagers qualify as state-authorized pari-mutuel wagers. Because Defendants' practices deviate from genuine pari-mutuel wagering, their conduct is not shielded by either state law or federal law and instead falls squarely within the prohibitions of the Illegal Gambling Business Act, 18 U.S.C. § 1955, as well as the Federal Wire Act, 18 U.S.C. § 1084.[4]

### C.      Injury and Causation

That the scheme has harmed Class members is beyond dispute. Stronach itself admits, in a filing with its California regulator, that allowing its CAW players to wager into the pools at California racetracks increases the effective takeout borne by retail bettors by 2.50%. ¶ 140 & fn. 19. Stronach's own conduct further confirms this harm: its partial restrictions on CAW play—such as Santa Anita Park's ban on CAW wagers placed within two minutes of post time in the win pool—reflect an acknowledgment that CAW participation distorts the pools to the detriment of ordinary bettors. ¶¶ 141, 143. The Complaint is explicit about the injury Plaintiff suffered: their wagers are devalued. The resulting shift in odds and corresponding financial loss is directly traceable to the scheme described in the Complaint—facts Defendants do not contest. And here, where totalizers maintain meticulous, auditor-ready records, there is no question that Plaintiff can not only conceptualize their injuries but quantify them with precision. ¶¶ 56–57.

---

[4] Should the Court determine that citing these specific statutes is necessary to plead these predicate acts, Plaintiff respectfully submits that any such oversight would be more efficiently cured by amendment of the Complaint rather than an unnecessary motion to dismiss.

HAGENS BERMAN

Sincerely,

/s/ *Steve W. Berman*

Steve W. Berman

cc: All Defendants' counsel (via ECF)