**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

FILED
CLERK
**10/23/2026**
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

-------------------------------------------------------------------X

RYAN DICKEY; NICHOLAS SEEVERS; MICHAEL O'BRIEN; TAMMY MONNIN; RANDALL RAYNOLDS; JOSEPH PALADINO and MIKE ZELEN, on behalf of themselves and all others similarly situated,

*Plaintiffs*,

-against-

THE STRONACH GROUP, INC; STRONACH GROUP SERVICES, LLC; CHURCHILL DOWNS, INC.; THE NEW YORK RACING ASSOCIATION; AMTOTE INTERNATIONAL, INC.; UNITED TOTE COMPANY; RACING AND GAMING SERVICES and ELITE TURF CLUB, LLC,

*Defendants*.

-------------------------------------------------------------------X

**REPORT AND RECOMMENDATION**

2:25-cv-05962 (JMA) (JMW)

**A P P E A R A N C E S:**

Anne Fornecker Johnson
**Hagens Berman Sobol Shapiro LLP**
68 3rd Street, Suite 249
Brooklyn, NY 11231

Karl Barth
Steve W. Berman
Sydney K. Thomas
**Hagens Berman Sobol Shapiro LLP**
1301 2nd Avenue Suite 2000
Seattle, WA 98101
*Attorneys for Plaintiffs*

Morris J. Fodeman
Sheryl Shapiro Bassin
**Wilson Sonsini Goodrich & Rosati**
31 West 52nd Street, Ste Fifth Floor
New York, NY 10019

David Noel Kelley
Hannah Y Shay Chanoine
**O'Melveny & Myers LLP**
1301 Avenue of the Americas, Suite 1700
New York, NY 10019-6022

David Kirman
Vision Winter
**O'Melveny & Myers LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
*Attorneys for Defendants The Stronach Group Inc., AmTote International, Inc., and Elite Turf Club, LLC*

John Tienken
Thomas Henderson Dupree , Jr
**Gibson, Dunn & Crutcher LLP**
1700 M St NW
Washington, DC 20036

Jordan Lancaster Estes
Justine Marie Goeke
**Gibson, Dunn & Crutcher LLP**
200 Park Avenue
New York, NY 10166
*Attorneys for Defendants Churchill Downs, Inc., and United Tote Company*

Cynthia E. Neidl
Henry M. Greenberg
**Greenberg Traurig, LLP**
54 State Street, 6th Floor
Albany, NY 12207

Christina Hernsdorf
**Foley Hoag LLP**
1301 Avenue of the Americas
New York, NY 10019
*Attorneys for Defendant The New York Racing Association*

Amanda R. Griner
Evan H. Krinick
**Rivkin Radler LLP**
926 RXR Plaza
Uniondale, NY 11556

Kristen L. Wenger
**Rivkin Radler, LLP**
1301 Riverplace Blvd., Suite 1000
Jacksonville, FL 32207

John Patrick Marino
**Smith, Gambrell & Russell, LLP**
50 North Laura Street, Suite 2600
Jacksonville, FL 32202
*Attorneys for Defendant Racing and Gaming Services (St. Kitts) Ltd*

Morris J. Fodeman
Sheryl Shapiro Bassin
**Wilson Sonsini Goodrich & Rosati**
31 West 52nd Street, Ste Fifth Floor
New York, NY 10019
*Attorneys for Defendant Elite Turf Club, NV*

**WICKS,** Magistrate Judge:

Plaintiffs are a class of individuals who engage in horse betting. They bring this action against Defendants, who, *inter alia*, own race tracks and operate the digital infrastructure upon which bets are placed, alleging that the system is "rigged" in favor of high-volume algorithmic wagerers at the expense of individuals such as Plaintiffs. Plaintiffs assert fourteen causes of action, the majority of which sound in fraud. For the reasons stated below, the First Amended Complaint (ECF No. 53; "FAC") should be dismissed for lack of Article III standing, as Plaintiffs fail to plead either injury in fact or causation. And the dismissal should be with prejudice, because (1) nothing any Defendant said was untrue, and (2) no Plaintiff relied upon any alleged misrepresentation or was otherwise proximately harmed thereby.

# BACKGROUND

## I. Summary of the Amended Complaint[1]

### A. Pari-Mutuel Wagering

Wagering on horse racing in the United States takes place under state laws that authorize "pari-mutuel" wagering. (FAC at ¶¶ 8, 12.) In a pari-mutuel system, all money bet on a given type of wager in a given race goes into a common pool, with a separate pool for each type of wager. (*Id.* at ¶¶ 44, 50–51.) The track removes a preset percentage of each pool, called the "takeout," which ranges from 6% to 31% depending on the bet type, and divides the remainder (the "net pool") among the holders of winning tickets in proportion to the amounts they bet. (*Id.* ¶¶ 9, 44, 46–47.) Thus, "[u]nlike a sportsbook, the house isn't setting odds or taking risk—the payoff depends entirely on how other bettors bet." (*Id.* at ¶ 45.) Similar to a market, the selections of the bettors determine what the odds are, and what the consequent payout will be. (*Id.* at ¶¶ 45–48.) Hence, the gamblers bet against each other, as their wagers set the odds rather than the house. (*Id.* at ¶¶ 45, 49.)

As a result of bettors gambling "against each other" rather than the house, the house is not shouldering the risk or loss of the payout. (*Id.*) Instead, the house, here the racetrack, takes a pre-set takeout percentage from the pool of money from the bettors. (*Id.* at ¶ 44.) The takeout covers purses, taxes, and operations, and is guaranteed to the house, regardless of who wins the race. (*Id.* at ¶¶ 44, 49.)

---

[1] The following facts are drawn from the First Amended Complaint (ECF No. 53 ("FAC")) and are assumed true only for purposes of the pending motions. The Court also considers the September 5, 2024 letter from Elite Turf Club, LLC to the California Horse Racing Board (ECF No. 80-3 ("Elite Letter")), which the FAC quotes and relies upon throughout (*see* FAC ¶¶ 13, 27 n.4, 61 n.8, 101 & n.22, 112 & n.27, 167 & n.32) and which is therefore incorporated by reference. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

A simple example illustrates the mechanics of pari-mutuel odds. (*See id.* at ¶¶ 47–48.) Suppose that in a two-horse race, bettors wager $20 on Horse A and $80 on Horse B, for a $100 win pool, and the track's takeout is 20%. The track keeps $20, leaving an $80 net pool. One way to picture the takeout is that every bettor's stake shrinks by the same 20%: the $20 on Horse A becomes, in effect, $16, and the $80 on Horse B becomes $64. If Horse A wins, its backers recover their own $16 plus the $64 staked on Horse B—$80 in all, or $4.00 for every dollar wagered. If Horse B wins, its backers divide the same $80 among $80 in winning tickets and get back only $1.00 per dollar, the amount they bet. (*See id.* at ¶ 47(c) ("Net Pool ÷ dollars on the winner = payout per $1 bet.").) Either way, a losing ticket forfeits its entire stake, and other bettors' money affects a bettor's return only if his ticket wins. (*See id.* at ¶¶ 44, 46–48.)

Because the payout depends on how much money is ultimately bet on each horse, the odds are not fixed when a wager is placed. (*Id.* at ¶¶ 45, 49; *see id.* at ¶¶ 47–48.) As the FAC acknowledges, "the posted odds at the time you made your bet are not the odds that you may wind up with for your bet." (*Id.* at ¶ 49.) That is because the odds and expected payout in a pari-mutuel gambling system shift as new money enters the pool. (*Id.* at ¶¶ 45, 49.) The gambler is making his wager with the knowledge that the posted odds can move right up until the time of the race, as bets made at the last moment are still being processed as the race begins. (*Id.* at ¶¶ 47(d), 49.) Returning to the example above, if more money is subsequently placed on Horse A, it means the market no longer views Horse A as such a longshot; in turn, this reduces the winnings for anyone who bet on Horse A. Importantly, this matters only if Horse A ends up winning. If Horse A loses, then everyone who bet on Horse A receives nothing, regardless of whether the odds were 3-1 or 2-1 or 10-1.

At a traditional racetrack, or even on an app, a bettor's ability to take advantage of mismatches or inefficiencies in the odds are limited by time and his ability to process the information and make a wager in time before the gate opens. (*Id.* at ¶¶ 85–86, 88.) However, betting has largely moved from the racetrack to telephone and internet-based "Advance Deposit Wagering" ("ADW") platforms. (*Id.* ¶¶ 10, 54–56.) Now that the system is largely online and driven by algorithms and artificial intelligence, predictions and the posting of bets can all happen in less than a second, right up until the moment the race begins. (*Id.* at ¶¶ 10, 57, 85–86.)

### B. The Parties

The FAC names eight Defendants, which can be categorized along two axes. First, the Defendants can be categorized by what they do:

1. Some Defendants own and operate racetracks. This group includes: The Stronach Group, Inc. and its U.S. holding company, Stronach Group Services, LLC (collectively, "Stronach"); Churchill Downs, Inc. ("Churchill Downs"); and The New York Racing Association ("NYRA"). (*Id.* at ¶¶ 23–24, 30, 33.)

2. Two Defendants—United Tote Company ("United Tote") and AmTote International, Inc. ("AmTote")—are "totalizers" or "totes." (*Id.* at ¶¶ 25, 31.) Tote companies process wagers, calculate odds, lock pools at the "stop-bet" signal, and settle payouts. (*Id.* at ¶¶ 64, 69–71.) According to the FAC, AmTote and United Tote "are the dominant totalizator service providers for racetracks in North America[,]" and their "infrastructure is the clearinghouse of U.S. pari-mutuel wagering — essentially operating the wagering pools for every racetrack[.]" (*Id.* at ¶ 64.) The tote companies serve as "the middleman between bettors (on-track, ADW or CAWs) and each racetrack's pools." (*Id.* at ¶ 65; *see also id.* at ¶¶ 66 –71.)

3. The last group of Defendants operate computer-assisted wagering ("CAW") services. This group includes Defendants Elite Turf Club, LLC and Elite Turf Club, NV (together, "Elite") and Racing and Gaming Services (St. Kitts) Ltd. ("RGS"). According to the Amended Complaint, three CAW platforms—Defendant Elite, Defendant RGS, and non-party Velocity—"service all, or the vast majority of" the CAW bettors. (*Id.* at ¶¶ 60.)[2] (CAW is described in greater detail below.)

---

[2] It is not clear why Plaintiffs are suing two of the dominant CAW platforms—Elite and RGS—but not the third, Velocity. Paragraphs 32 and 105 identify Velocity as a defendant. This appears to be incorrect, as Velocity is not listed in the case caption.

The second way Defendants can be categorized is by ownership structure. Central to Plaintiffs' narrative of an alleged scheme or conspiracy is the fact that Defendants are "vertically integrated," which, according to Plaintiffs, "gave Defendants complete control over the [betting] pools—and complete power to rig them." (ECF No. 77-2 at 1–2.) The three Defendants listed above as owning racetracks—Stronach, Churchill Downs, and NYRA—also own many of the other Defendants and relevant non-parties. Specifically:

1. Stronach owns Defendant AmTote; 80% of Defendant Elite; and the Xpressbet and 1/ST Bet ADW platforms. (FAC at ¶¶ 23–29, 61, 99.)

2. Churchill Downs owns a majority stake in Defendant United Tote; a computer-assisted wagering platform called Velocity; and the TwinSpires ADW platform. (*Id.* at ¶¶ 30–32, 62, 99.)

3. NYRA owns 49% of Defendant United Tote; 20% of Elite; and the NYRA Bets ADW platform. (*Id.* at ¶¶ 27, 31, 33.)

4. Defendant RGS stands alone—it neither owns nor is owned by any other entity relevant to this story. (*Id.* at ¶¶ 34, 63.)

Stated more simply, each racetrack owner—Defendants Stronach, Churchill Downs, and NYRA—also has a stake in an ADW platform (all of which are non-parties); a totalizer (Stronach owns AmTote, while Churchill Downs and NYRA share United Tote); and a CAW (Churchill Downs owns non-party Velocity, while Stronach and NYRA share Elite).

Plaintiffs are seven bettors from seven states who wagered through various ADW platforms, principally TwinSpires, Xpressbet, TVG, and NYRA Bets. (*Id.* at ¶¶ 16–22.) Four allege approximate weekly wagering volumes ranging from about $100 to almost $1,900; five allege that they cut back on wagering because of computer-assisted wagering; and Plaintiff Dickey alleges that "[w]hen he became aware of the problems with the manipulation of the betting pools, he stopped betting on horse racing." (*Id.*) Each alleges, in identical language, that he or she expected "any payout based on the odds one would expect from a betting system free from any

agreement or scheme that rigged payouts to favor certain groups," and "incurred financial losses as a result of the scheme." (*Id.*) Notably, however, no Plaintiff identifies a single wager: no track, race, date, pool, amount, or result. (*See id.*) No Plaintiff alleges ever having held a winning ticket—the only kind of ticket whose return other bettors' money can affect. (*See id.* at ¶¶ 16–22, 44, 46–48.)

### C. Computer-Assisted Wagering and the Alleged Scheme

Computer-assisted wagering ("CAW") is "high-volume pari-mutuel betting done by professional teams using models, direct tote connections, and automation to fire thousands of highly targeted bets—often in the final seconds before pools close." (*Id.* at ¶ 57.)

Plaintiffs allege the existence of a privileged group of insiders dubbed the "Insider Betting Group." (*Id.* at ¶ 10.) The members of the Insider Betting Group are not parties, and their identities are "kept secret." (*Id.* at ¶ 11.) The Insider Betting Group bets in much higher volumes than the typical bettor by employing CAW. (*Id.*) The identity of these insiders is known only to the Defendants, but they make up approximately one-third of the horse betting pool in the United States. (*Id.* at ¶¶ 11, 158.)

Plaintiffs allege that Defendants offer special benefits to the Insiders, such as advantages in price, pool access, and information access. (*Id.*) For example, Defendants allegedly give them rebates that lower the effective takeout from their winnings, allowing the Insiders to play strategies that are unavailable to the average bettor—but that affect the average bettor's winnings. (*Id.* at ¶¶ 66–70.) The Insider Betting Group also can skew the betting pool and odds at rapid speed and at a large volume right before the race begins, eliminating transparency from the posted odds that dictate a bettor's wager. (*Id.* at ¶ 71–73.) Plaintiffs allege that these advantages, and their consequent substantial payouts, are all at the expense of the average bettor, like the Plaintiffs. (*Id.*

at ¶¶ 80–84.)

The principal advantage is pricing. Plaintiffs allege that Insider Betting Group members "receive rebates/low host-fee deals that are unavailable to the public/retail players." (*Id.* at ¶ 80.) If the track's takeout is 20% and a CAW bettor receives a 13% rebate, the CAW bettor's effective takeout is 7%. (*Id.* at ¶ 81.) A betting strategy that returns 92 cents on the dollar will then cost a retail bettor 8% but yield the CAW bettor a 5% profit. (*Id.* at ¶ 82.) Rebates thus make it profitable for CAW bettors to pursue strategies that "would bankrupt a retail player," at enormous volume. (*Id.* at ¶¶ 80, 83–84.)

Plaintiffs further allege that CAW bettors connect to the tote systems "through dedicated, low-latency links" that give them "[t]he ability to submit thousands of bets per second" and "[p]riority processing queues," and that AmTote's hub "can process up to 2,000 bets/second from a single client." (*Id.* at ¶¶ 72, 86.) Using these connections, CAW algorithms place "large, split-second wagers in the final seconds before the pool closes—something ordinary players cannot do," allowing them to "'[s]nipe' overlay bets that the public created earlier" and to "cause last-second odds drops that destroy value for retail bettors." (*Id.* at ¶ 85; *see id.* at ¶¶ 73, 87.) According to the FAC, "[w]hen a horse goes from 6-1 to 3-1 after the gate opens, it's usually a CAW batch bet that moved the pool," because tote systems "take 13–17 seconds to finish merging and display final odds." (*Id.* at ¶¶ 85, 166(b).)

Plaintiffs allege that Defendants permit these practices because they profit from them: more CAW betting means more handle subject to takeout at Defendants' tracks, more processing fees for the tote companies, and more revenue for the CAW platforms that Defendants own. (*Id.* at ¶¶ 108–111.) The FAC quotes Elite's explanation that "[r]acetrack operators play an important role in regulating Elite's activities by determining an acceptable ratio of CAW play to retail play and

adjusting host fees paid by Elite players (which incentivizes more/less wagering) to achieve the desired balance." (*Id.* at ¶ 101.) In Plaintiffs' view, "a racetrack that also owns the CAW platform has every incentive to allow permissive CAW rules regardless of their impact on the public." (*Id.*)

**D. Effective Takeout and the Elite Letter**

The FAC's theory of harm turns on the concept of "effective takeout." (*See id.* at ¶¶ 13, 80–84, 112, 166(a).) The posted takeout and the payout formula are the same for every bettor in a pool. (*See id.* at ¶¶ 44–49.) But because the net pool is fixed once the takeout is removed, any group that consistently takes back more than its proportionate share leaves less for everyone else—"one side's edge directly reduces the other's." (*Id.* at ¶ 91; *see id.* at ¶ 165.)

Elite addressed that dynamic in a September 5, 2024 letter to the California Horse Racing Board responding to questions from the public about CAW. (Elite Letter at 2.) One question asked: "How has Elite's management determined that allowing Elite players to wager into the pools at California racetracks increases the effective takeout for retail players by two and a half percent (2.50%)?" (*Id.* at 7.) Elite answered that "[t]he impact of winning players on the rest of the players in the pool is a function of the winning players' percentage of the pool and win rate," and that "[t]his is true whether the winning players are CAW players or non-CAW 'sharp' players." (*Id.* at 6–7.) Elite then assumed "(a) a 20% takeout, (b) 80% of the pool is retail money, (c) 20% of the pool is CAW money, (d) the CAW money has a win rate of 90%, and (e) a total pari-mutuel pool of $100,000," and calculated:

> Theoretical CAW Return = 20% x 80% x $100,000 = $16,000
> Actual CAW Return = 20% x 90% x $100,000 = $18,000
> CAW Win Above Theoretical = $18,000 - $16,000 = $2,000
> Theoretical Retail Return = 80% x 80% x $100,000 = $64,000
> Actual Retail Return = $64,000 - $2,000 = $62,000
> Actual Retail Win Percentage = $62,000 / $80,000 = 0.775 = 77.5%
> Actual Retail Takeout = 100% - 77.5% = 22.5%

(*Id.* at 7–8.)

In plain terms, the 20% takeout leaves $80,000 to be paid out. If both groups fared equally, each would get back 80 cents on the dollar: $16,000 to the CAW bettors and $64,000 to the retail bettors. Because the CAW bettors instead get back 90 cents on the dollar ($18,000), the retail bettors recover only $62,000 of the $80,000 they wagered—77.5 cents on the dollar. From the retail bettors' perspective, the 20% posted takeout has become, in effect, a 22.5% takeout. (*Id.*) The "win rate" in this calculation means "cashed tickets divided by wagers"—dollars returned per dollar bet—rather than the percentage of bets that win. (*Id.* at 5–6.) Elite cautioned that the calculation "is not intended to show that CAW is good or is bad" but "is merely a mathematical calculation of the impact winning players have on the rest of the players if the winning players constitute 20% of the pari-mutuel pool and win at 90% instead of 80%." (*Id.* at 7.) As Elite put it, "[i]f CAW players were excluded from the pools of the California racetracks tomorrow, there would still be winning players. And those winning players would cause a takeout increase on the rest of the players in the pools." (*Id.*)

The FAC characterizes the letter as an admission that "allowing the Elite CAWs to bet into the pools increases the effective takeout for retail players by two and a half percent (2.50%)," and alleges that because the Insider Betting Group's actual share of the pools exceeds 20%, "Elite's damage model significantly understates the damages caused to the Class." (FAC at ¶¶ 13, 112; *see id.* at ¶ 167.) Plaintiffs likewise characterize as admissions the restrictions that some tracks have placed on late CAW betting: NYRA's 2021 requirement that CAW win wagers be placed more than three minutes before post, Santa Anita's similar two-minute restriction in 2025, NYRA's exclusion of CAW bettors from its late Pick-5 wager, and NYRA's January 30, 2026 ban on CAW wagering in all pools in the final minute before post. (*Id.* at ¶¶ 113–116.)

### E. The Alleged Misrepresentations and Omissions

Plaintiffs allege that "Defendants advertised the pari-mutuel betting pools in horse racing as neutral and fair" while concealing the advantages given to the Insider Betting Group. (*Id.* at ¶ 92.) Plaintiffs identify several public statements by the Stronach entities, Churchill Downs, NYRA, and Elite concerning the fairness and operation of pari-mutuel wagering. (FAC at ¶¶ 93–98.) Those statements generally represent that bettors wager against one another rather than the racetrack, that CAW bettors are subject to the same rules and data as retail bettors, and that the wagering system is fair and transparent. (*Id.*; *see infra* § II.B.) Plaintiffs allege that these representations were false or misleading because Defendants failed to disclose the preferential pricing, access, information, and other advantages allegedly afforded to the Insider Betting Group. (FAC at ¶¶ 93–98.)

In addition, Plaintiffs allege that the odds displayed to bettors are themselves "a misrepresentation," because "[a]t the time a bet is placed, there is no disclosure that these are not true odds." (*Id.* at ¶¶ 52–53.) The state-law counts allege more generally that Defendants made "numerous misrepresentations that they ran a parimutuel betting system wherein all participants have equal access to information, equal ability to place timely bets, and are not betting against the house" (*id.* at ¶ 234; *see id.* at ¶¶ 251, 267, 281, 292, 307), and that Defendants failed to disclose both their conflict of interest as owners of CAW platforms and "the existence, scope, or impact of these preferential advantages" (*id.* at ¶ 309; *see id.* at ¶ 192). No Plaintiff alleges having seen, read, or heard any of the statements identified above. (*See id.* at ¶¶ 16–22.)

### F. The Claims

Plaintiffs bring this action on behalf of a putative class of "[a]ll persons in the United States who placed wagers into CAW-Impacted horse race betting Pools on Thoroughbred horse races

while not using a CAW account," and seven state subclasses. (*Id.* at ¶¶ 117–118.)[3] Count I asserts violations of RICO, 18 U.S.C. § 1962(c) and (d), against all Defendants, alleging that Defendants together form a "Pool Rigging Enterprise" that coordinated "at meetings and through communications of which Plaintiff cannot fully know at present," and that they committed predicate acts of mail fraud, wire fraud, and the conduct of an illegal gambling business under 18 U.S.C. § 1955. (*Id.* at ¶¶ 131–132, 142, 152–164.) Counts II through IV assert common-law claims for conversion, unjust enrichment, and civil conspiracy. (*Id.* at ¶¶ 171–82.) Counts V through XIV assert consumer-protection claims under the laws of each named Plaintiff's home state, each on behalf of a state subclass. (*Id.* at ¶¶ 183–315.) Plaintiffs seek compensatory and treble damages and other relief. (*Id.* at ¶¶ 200, 260, 303, 315.)

## II. Summary of the Motions

Currently before the Court are five motions to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. All Defendants join in an "omnibus" motion arguing that the FAC fails as to everyone. And various Defendants submitted individual motions arguing that, in addition to the arguments laid out in the omnibus motion, the FAC fails as to them in particular for separate reasons:

- Defendants Churchill Downs and United Tote (the "Churchill Downs Defendants") argue that, *inter alia*, the FAC does not allege any wrongdoing by United Tote; the FAC does not plausibly allege that any statement made by Churchill Downs Defendants was false or misleading; and the Plaintiffs who utilized the Churchill Downs Defendants' ADW platforms agreed to terms and conditions waiving class claims. (ECF No. 78-1.)

[3] The FAC does not define "CAW-Impacted" or otherwise explain how to distinguish pools affected by CAW activity from those that were not. (*See* FAC at ¶¶ 117–118.) Plaintiff Zelen alleges that he "sought wagering pools unimpacted by CAWs in recent periods." (*Id.* at ¶ 22.)

- Defendant NYRA argues, *inter alia*, that the FAC's claims as to NYRA are conclusory, vague, and fail to state any coherent theory of wrongdoing; that the RICO claim against NYRA is time-barred; and that NYRA is exempt from damages under RICO because it is a state actor. (ECF No. 79-1.)

- Defendants The Stronach Group, Inc., Amtote International, Inc., Elite Turf Club, LLC, and Elite Turf Club, NV (collectively, the "Stronach Defendants") argue that certain Plaintiffs lack Article III standing against the Stronach Defendants because they do not allege that they ever used the Stronach Defendants' ADW platforms. (ECF No. 80-1.) The Stronach Defendants also reiterate arguments laid out in the omnibus brief, namely, that the FAC does not state any coherent theory of injury nor any false statement as to anyone. (*Id.*)

- Defendant Racing and Gaming Services (St. Kitts) Ltd. ("RGS") argues, *inter alia*, that Plaintiffs lack Article III standing as to RGS because the FAC does not allege any Plaintiff "had any interaction with RGS, utilized RGS' services, or suffered any other injury traceable to RGS"; and that Plaintiffs' RICO and state-law claims against RGS fail because the FAC does not attribute any allegedly misleading statement to RGS. (ECF No. 81-1.)

## DISCUSSION

### I. Article III Standing

Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997)). The essence or "core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). That is, standing is precisely "what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998).

The judicial power derived from Article III "exists only to redress or otherwise to protect against injury to the complaining party." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The "irreducible constitutional minimum of standing" has three elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff "must show (i) that [the plaintiff] suffered an injury in fact

that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423 (citing *Lujan*, 504 U.S. at 560–61). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).

To be concrete, the injury must actually exist and not be abstract, and to be particularized, the injury must affect plaintiff in a personal and individual way. *Spokeo*, 578 U.S. at 340. Regarding the causal connection element, a plaintiff must show that the injury is "fairly traceable to the challenged conduct of the defendant, and not the result of the independent action of some third party not before the court." *Atares Bais Yaakov Academy of Rockland v. Town of Clarkstown*, 88 F.4th 344, 352–53 (2d Cir. 2023). "[A]n intervening cause of a plaintiff's injury is not necessarily a basis to find that the injury is not 'fairly traceable' to a defendant's conduct, even if that intervening cause would foreclose a finding of proximate cause." *Doe v. Columbia Univ.*, 551 F. Supp. 3d 433, 456 (S.D.N.Y. 2021).

Finally, for the redressability requirement, the plaintiff must show "that it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit." *Oliver v. American Express Co.*, No. 19-CV-566 (NGG) (SMG), 2020 WL 2079510, at *7 (E.D.N.Y. Apr. 30, 2020) (citations omitted). Specifically, "[w]hen the injury alleged is caused by the illegal conduct, in many instances (at least where continuation of the illegal conduct will continue to cause harm), the cessation of the illegal conduct will be likely to at least diminish further instance of the injury." *Id.*

When a party moves to dismiss for lack of standing, the party is moving for lack of the Court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)) ("A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.").

To survive a motion to dismiss for lack of subject matter jurisdiction under 12(b)(1), the "plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence." *Id.* A plaintiff bears the burden of "alleging facts that affirmatively and plausibly suggest that they have standing to sue." *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 184 (2d Cir. 2020) (citation modified; internal citation omitted). Where a plaintiff fails to satisfy this burden, a court may dismiss the action against the party the court lacks standing over pursuant to Federal Rule of Civil Procedure 12(b)(1). *Conn. Citizens Def., League, Inc. v. Thody*, 2024 WL 177707, at *2 (2d Cir. Jan. 17, 2024).

**A. Injury in Fact**

Defendants argue that the Plaintiffs fail to meet the pleading standard to demonstrate Article III standing by failing to allege any injury. (ECF No. 77-2 at 11–13.) The Defendants argue that Plaintiffs cannot point to specific bets where the Plaintiff won, but the Plaintiffs' winnings were diminished because of the actions of the Defendant. (*Id.* at 11.)

The Second Circuit has cautioned against an overly granular pleading standard—a plaintiff need not plead evidence. *See John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737–38 (2d Cir. 2017) (rejecting the district court's requirement that the plaintiff identify specific overcharged purchases and holding that allegations of systematic overcharging coupled with alleged regular purchases of the affected products plausibly alleged injury in fact); *Hu v. City of*

*New York*, 927 F.3d 81, 89–90 (2d Cir. 2019) (finding standing where plaintiffs generally alleged economic harms and identified representative examples of those harms, rather than cataloging every individual injury). Here, however, Plaintiffs fail to meet even this modest threshold, as they do not allege any coherent injury whatsoever.

The closest Plaintiffs come is with the allegation that Defendants' conduct increased the effective takeout paid by ordinary bettors and therefore reduced Plaintiffs' expected winnings. (FAC ¶¶ 165–166.) This claim of a 2.5% increase in effective takeout stems from a letter from Elite Turf Club, LLC to California Horse Racing Board dated September 5, 2025. In the letter, Scott Daruty, president of Elite Turf Club, addresses concerns about the effect of the Insider Betting Group on ordinary bettors. (ECF No. 80-3 at 6-7.) Scott Daruty explains the increased takeout calculation:

> The impact of winning players on the rest of the players in the pool is a function of the winning players' percentage of the pool and win rate. This is true whether the winning players are CAW players or non-CAW "sharp" players.
>
> . . . .
>
> Santa Anita Park believes that in a healthy betting ecosystem CAW play should hover around 20% of its total handle (plus or minus a few percent), and should have a win rate (meaning cashed tickets divided by wagers) that is not materially higher than 90%. Santa Anita Park is operating within these parameters. . . .
>
> As for the calculation referenced by Elite management, assume (a) a 20% takeout, (b) 80% of the pool is retail money, (c) 20% of the pool is CAW money, (d) the CAW money has a win rate of 90%, and (e) a total pari-mutuel pool of $100,000.
>
> The impact of the CAW players on the retail players can be determined as . . . Actual Retail Takeout = 100% - 77.5% = 22.5%

(*Id.*)

Although Elite proposes this effective takeout increase as a theoretical number, it concedes that the figures used in the hypothetical are the ranges that the racetrack seeks to maintain. (*Id.*) Furthermore, Plaintiffs allege that they regularly placed bets on Defendants'

platforms; one might therefore argue that the FAC raises a reasonable inference that Plaintiffs' bets may have been commingled in pools that were affected by CAWs. (FAC at ¶10; ECF No. 77-2 at 8.)

Still, it is not enough. Although it may be plausible that Plaintiffs' bets commingled in pools that were affected by CAWs, Plaintiffs do not allege so outright. Even setting that aside, the FAC fails at a more basic level: Plaintiffs do not plead that they ever even *won* a single bet. As explained above, and as conceded by all parties, CAWs do not diminish the winnings of a bettor who backed the wrong horse—zero is zero. The impact of CAWs, including the admitted-to 2.5% increase in effective takeout, is felt only by those who won. Yet the FAC is glaringly silent on whether any Plaintiff ever won any bet ever placed on any platform in any pool.[4]

Contrast the FAC here with the complaint in *Whole Foods*. There, the plaintiff alleged that he "routinely shopped" at two Whole Foods stores in Manhattan during 2014 and 2015, and made "regular purchases" of "pre-packaged products," including "pre-packaged cheese and cupcakes approximately one or two times per month." *Whole Foods*, 858 F.3d at 734 (citations modified). The complaint "d[id] not identify a specific food purchase as to which Whole Foods overcharged" the plaintiff. *Id.* But it did describe "pervasive overcharging of pre-packaged food throughout Whole Foods' stores in New York City." *Id.* Specifically, a government regulator

---

[4] Perhaps cognizant of this tension, Plaintiffs' opposition brief (ECF No. 77-2) equivocates as to what exactly their alleged harm is. The brief insinuates that their injury is that they "stopped betting entirely" after realizing the system was rigged. (*Id.* at 8.) This avoids the standing issue, because the injury would be cognizable even if they never won a bet. But it contradicts Plaintiffs' underlying theory—pleaded repeatedly throughout the FAC and the briefs—that their injury is due to the "zero-sum" nature of pari-mutuel betting. (*See, e.g.*, FAC at ¶ 165.) In a different brief, Plaintiffs suggest yet a third theory of harm: "The odds at which Plaintiffs wagered were themselves distorted by the CAW scheme—last-second bets by CAWs with superior information caused odds drops that reduced payouts to winning retail bettors. Plaintiffs' injury is not merely the loss of a speculative chance; it is the concrete deprivation of money that would have been paid to them but for the scheme." (ECF No. 80-5 at 5.) This makes no sense. The ability of certain players to cast bets at the last second is not a result of Defendants' alleged scheme; it simply means they have better hardware and software. In any event, such equivocation underscores that the FAC barely passes muster under Rule 8, let alone Rule 9(b).

"tested packages of 80 different types of pre-packaged products and found all of the products had packages with mislabeled weights." *Id.* This investigation took place from fall 2014 to winter 2015—"the same period in which [the plaintiff] allegedly made monthly purchases of cheese and cupcakes." *Id.* at 735. "The investigation focused on the eight Whole Foods stores operating in New York City during that period, which included the two stores that [the plaintiff] patronized[,]" and "Whole Foods has since confirmed that cheese and cupcakes were among the pre-packaged products that the [regulator] alleged were mislabeled with overstated weights." *Id.* On these facts, the Second Circuit found injury-in-fact adequately pleaded: "Whole Foods packages of cheese and cupcakes were systematically and routinely mislabeled and overpriced, and [the plaintiff] regularly purchased Whole Foods packages of cheese and cupcakes throughout the relevant period." *Id.* at 737.

Here, by contrast, Plaintiffs do not allege that they ever held a winning ticket. That would be like the plaintiff in *Whole Foods* alleging that he shopped at Whole Foods stores generally, but refusing to state *which* stores, and more to the point, refusing to state whether he ever purchased any pre-packaged products. The Court cannot assume Plaintiffs were impacted by the alleged rigging scheme. On this basis alone, the FAC should be dismissed, albeit without prejudice. *See Whole Foods*, 858 F.3d at 735 ("[W]here a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice." (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54 (2d Cir. 2016)).

**B. Causation**

Even if Plaintiffs had pleaded injury in fact, the FAC would fail standing on the second prong of Article III: causation, also known as traceability. There are two problems with causation here.

First, "[i]n a case involving fraud or misrepresentation," Article III's causation requirement "means that the alleged misrepresentation must—in some plausible fashion—be the cause of the alleged injury." *Barry's Auto Body of NY LLC, v. Allstate Fire & Casualty Insurance Company, Inc.*, No. 24-CV-1309 (EK)(LKE), 2026 WL 2920312, at *4 (E.D.N.Y. Sept. 28, 2026). Where the defendant's alleged falsehood "is doing no work" in the plaintiff's theory of harm—that is, where the plaintiff's harm "would exist irrespective of [the] misleading statements"—the plaintiff lacks standing, because "there can be no recovery if the plaintiff is none the worse off for the misrepresentation[.]" *Id.* (internal citation omitted). "Thus, '[f]or centuries, misrepresentation torts have required a showing of justifiable reliance and actual damages.'" *Id.* (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 998 (11th Cir. 2020)) (alteration in original).

The FAC does not make that connection. As noted above, Plaintiffs' only coherent theory of harm is that their effective takeout was increased by 2.5%. The FAC, read charitably, seems to plead an inducement theory based on the misstatements made by Defendants.[5] Plaintiffs allege in a conclusory fashion that they expected payouts from a betting system free from a scheme favoring the Insider Betting Group. (FAC ¶¶ 16–22.) "When [they] became aware of the problems with the manipulation of the betting pools," five of the seven Plaintiffs reduced their gambling, and one ceased entirely. (*Id.*) *Ipso facto*, these allegations suggest that Plaintiffs' initial gambling was only ever because Defendants had deceived them by holding out

[5] The Court in *Barry's* acknowledged that "individual reliance is not always necessary to establish Article III standing" in a fraud case. *Barry's*, 2026 WL 2920312, at *4 n.5. "For example, under the 'price premium' theory, a misrepresentation can inflate a product's prevailing market price for everyone, not just those who saw it. So, in many circumstances, a plaintiff can be injured—and recover—simply by paying that inflated price, even if she never encountered the misrepresentation herself." *Id.* (internal citation omitted). Here, however, the FAC does not appear to plead any theory of price premium or fraud on the market or the like.

the games as fair and covering up the manipulation; had Defendants not lied, Plaintiffs never would have gotten involved. But, fatally, no Plaintiff alleges having seen, heard, or otherwise been aware of any of the challenged statements before wagering. (*See generally* FAC; ECF No. 77-1 at 20.) Indeed, some of the alleged misstatements were made the initial Complaint was filed. (*See* FAC at ¶ 93 & n.12[6]; ¶ 98 & n. 17.) Thus, even assuming that Plaintiffs wagered because they believed the betting system operated differently, the FAC does not plausibly allege that Defendants' challenged statements created that belief or induced Plaintiffs to wager. And even that assumption is tenuous. Only one Plaintiff—Dickey—alleges that he stopped betting after learning of the alleged manipulation; five of the Plaintiffs merely cut back but did not cease altogether, and Monnin does not even allege that she cut back. (*See* FAC at ¶¶ 16–22.) If Plaintiffs' prior gambling was only because Defendants had pulled the wool over their eyes, one would expect that, upon learning the truth, they would stop throwing money into a rigged system. Plaintiffs therefore fail to plausibly allege that they were "worse off for the misrepresentation," rather than suffering losses that would have occurred irrespective of the alleged misstatements. *Barry's*, 2026 WL 2920312, at *4 (internal citations omitted).

Second, even setting the alleged misrepresentations aside, the FAC does not plausibly trace Plaintiffs' diminished payouts to Defendants' preferential treatment of the Insider Betting Group. An injury must be "fairly traceable to" the Defendants' conduct "and not the result of the independent action of some third party not before the court." *Atares Bais Yaakov Academy of Rockland*, 88 F.4th at 352–53. The Court is mindful that "the 'fairly traceable' standard is lower than that of proximate cause," *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013), but the FAC

---

[6] Footnote 12 of the FAC dates this statement at October 20, 2025, which would put it before the Complaint, which was filed October 24, 2025. But that chronology is impossible, because the statement was made *in response to this suit*. The Court's independent research indicates the statement was released October 30, 2025.

fails to meet even this modest threshold. There are too many contingent steps between Defendants' alleged actions and the harm ultimately suffered by Plaintiffs. For the alleged preferential treatment of CAW bettors to have reduced a particular Plaintiff's payout, a number of things would need to happen simultaneously. As already discussed in the previous section, the Plaintiff would need to have bet on the winning horse. If this were the only problem, Plaintiffs could amend to plead that they sometimes won bets. But for purposes of traceability, that is just the beginning. They would also need to plead that their wagers ended up in the same pool as a CAW, and the CAW *also* bet on the winning horse, thereby diminishing their winnings.[7] Ending up in the same pool as a CAW is not as likely as it may sound. By Plaintiffs' own telling, there is a separate pari-mutuel pool for each type of wager—win, place, show, exacta, trifecta, superfecta, daily double, pick 3, etc.—"and each pool is separate from each of the other betting pools." (FAC at ¶ 51.) What's more, "the bulk of CAW betting" occurs in "the exotics (exacta, trifecta and superfecta) pools." (*Id.* at ¶ 166(d).) The FAC does not cite statistics about how often CAWs cast bets in ordinary pools, nor do Plaintiffs allege how often they cast bets in exotics pools. (*See* FAC at 16 –22 (stating only which ADWs the Plaintiffs used, not what kinds of bets they cast or at which racetracks)); *contrast Whole Foods*, 858 F.3d at 734 (citing a government investigation of pre-packaged foods including cheese and cupcakes at eight specific Whole Foods sites, and specifying that the plaintiff bought cheese and cupcakes at two of those sites once or twice per month).

Hence, even if a Plaintiff *did* happen to lose money to a CAW—their wagers ended up in the same pool and they both picked the winning horse—that loss would not be attributable to Defendants. The uncertainty caused by contingent acts of independent third parties makes the

[7] Defendants count *eleven* speculative links. (ECF No. 77-1 at 11–12.) While that is an exaggeration, the underlying point—that the speculative links break the chain of causation—is well taken.

causal chain too attenuated to establish traceability. *See Brown v. Allstate Corp.*, 821 F. Supp. 3d 417, 426 (E.D.N.Y. 2026) (explaining that standing against a defendant for injury caused by a "final actor" requires that the defendant's conduct leave the final actor little discretion or control).

**C. Individual Motions Regarding Standing**

Having determined that the FAC as a whole fails to establish both injury in fact and traceability, the undersigned respectfully recommends dismissal of all claims by all Plaintiffs against all Defendants.[8] Nevertheless, in the event that the District Judge may disagree with the above analysis, the undersigned proceeds to address the following additional arguments that apply only to specific Defendants.

*1. Churchill Downs Challenges Standing of Plaintiff Zelen*

Plaintiff Zelen alleges that he placed wagers through XpressBet (Stronach's ADW) and TVG (ownership not specified in the FAC). (FAC at ¶ 22.) He does not allege that he ever used the Churchill Downs Defendants' ADW, TwinSpires, nor does he allege that he ever cast a bet at a racetrack owned by Churchill Downs. (*See id.*) The Churchill Down Defendants therefore argue that Zelen's claims against them must be dismissed, as Zelen "does not allege 'any dealings' with the Churchill Downs Defendants that 'injured [him] personally.'" (ECF No. 78-1 at 5 (quoting *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 61 (2d Cir. 2012).) Plaintiff responds that "[Zelen] need only plausibly allege that his injury is fairly traceable to the challenged conduct, even if indirect." (ECF No. 78-2 at 4 (citing *Chevron Corp. v. Donziger*, 833 F.3d 74 (2d Cir. 2016).)

[8] As noted above, dismissal for lack of Article III standing alone would be without prejudice. *Whole Foods*, 858 F.3d at 735. Nevertheless, for the reasons detailed below (§§ II–IV), the undersigned also finds that all fourteen counts fail on the merits, and therefore respectfully recommends that the FAC be dismissed with prejudice.

The Churchill Down Defendants are correct. The Supreme Court recently emphasized that courts may not "treat[] defendants, plaintiffs, and platforms each as a unified whole[,]" as "'standing is not dispensed in gross.'" *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). Rather, "'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Id.* (quoting *TransUnion*, 594 U.S. at 431). "Heeding these conditions is critically important in a sprawling suit" involving "[d]ifferent groups of defendants" and "different platforms," and the court must "untangle the mass of the plaintiffs' injuries" to determine Article III standing. *Id.* at 61–62.

Here, although Plaintiffs allege in conclusory fashion that each of the Defendants conspired to create a system that systematically reduced the winnings of Plaintiffs, this conspiracy is not enough to establish traceable standing against parties with whom Zelen had no contact. *See Mahon*, 683 F.3d at 65 (holding that a plaintiff does not have Article III standing to sue non-injurious defendants, even if "the injurious defendant is sued in the same case" and even if the non-injurious defendant "engaged in similar conduct that injured other parties").

Accordingly, Zelen's claims against the Churchill Downs Defendants should be dismissed.

2. *NYRA Challenges All Plaintiffs' Standing and Alleges Lack of Involvement in the Scheme*

NYRA argues that Plaintiffs lack standing against it because none alleges that he or she ever cast a bet at any racetrack NYRA owned. (ECF No. 79-3 at 2.) But NYRA concedes that Plaintiff Seevers used its ADW platform, NYRA Bets, and it does not explain why standing requires wagering at a NYRA racetrack rather than through NYRA's platform. (*Id.*) Seevers

therefore has standing as to NYRA (again, setting aside the arguments above (§ I.A–B) that no Plaintiff has standing against any Defendant).

With respect to all other Plaintiffs, however, NYRA is correct. All Plaintiffs, other than Seever, fail to allege injury traceable to NYRA. The fact that NYRA has an ownership stake in Elite and United Tote is of no moment, even if one of them were alleged to have injured Plaintiffs. *See Brown*, 821 F. Supp. 3d at 425–27 (finding that injury by a subsidiary was not traceable to the parent company where the parent was not alleged to have had "determinative and coercive" influence over the subsidiary's actions).

NYRA separately argues that the FAC fails to allege its involvement in any wrongdoing, so, even setting aside Article III standing, all claims must fail on the merits. (ECF No. 79-1 at 5.) The Court disagrees: the FAC sufficiently alleges NYRA's involvement in the alleged scheme. (*See generally* FAC.) NYRA owns significant stakes in United Tote and Elite, operates three racetracks and controls their wagering rules, and allegedly benefited from increased handle and its ownership interests. (FAC ¶¶ 33, 61, 64, 137, 146.) As such, NYRA is hardly a bystander in this affair. To the extent the FAC coherently states a claim as to anyone, NYRA would be no less implicated than any other Defendant. Therefore, Seevers, who did interact with NYRA, would have standing to pursue claims against it.

In sum, all Plaintiffs other than Seevers lack standing to sue NYRA.

#### *3. United Tote Challenges Standing, Alleging It Is Not Responsible for Any Injury to Plaintiffs*

The Churchill Downs Defendants assert that Plaintiffs fail to allege any misconduct by United Tote, so all claims against United Tote should be dismissed for, *inter alia*, lack of standing. (ECF No. 78-1 at 4.) The Churchill Downs Defendants are correct that United Tote's mere common ownership with Churchill Downs is insufficient to make a claim against United

Tote, as "there are no allegations that United Tote itself engaged in any 'allegedly unlawful conduct.'" (*Id.* at 5 (quoting *Mahon*, 683 F.3d 64).) But even setting aside Churchill Downs and just evaluating United Tote on its own merit, the Court is not convinced. Like NYRA, United Tote is a central character in the FAC. As Plaintiffs explain, United Tote "reconciles every transaction, generates settlement reports, and credits funds to: a) Host tracks; b) Simulcast partners; and c) ADWs and CAWs (net of takeout, fees, and rebates)." (ECF No. 78-2 at 3.) Indeed, the FAC alleges that United Tote, as one of the two dominant totalizers on the market, is responsible for "[o]perating the host and guest hubs that merge all bets in the pools and gates, timestamps and settles all bets in the pools[.]" (FAC at ¶ 139; *see also id.* at ¶ 153 (chart).)

To be clear, this is not the same as saying United Tote did anything wrong. That is a merits question, which the Court evaluates below. The point here is simply that *if* Plaintiffs' theory of an illicit scheme has merit, United Tote is a sufficiently central and pervasive character in that scheme that Plaintiffs have standing to pursue claims against it. And, again, this whole analysis is only in the alternative; if the District Judge accepts the arguments above (§ I.A–B) that no Plaintiff has standing against any Defendant, then of course claims against United Tote must be dismissed as well.

*4. The Stronach Group, Inc., Amtote International, Inc., Elite Turf Club, LLC, and Elite Turf Club, NV (collectively, "Stronach") Challenges Standing of Plaintiffs Dickey, Monnin, Raynolds, and Paladino*

Defendants The Stronach Group, Inc., Amtote International, Inc., Elite Turf Club, LLC, and Elite Turf Club, NV (collectively, "Stronach") argue that four of the named Plaintiffs (Dickey, Monnin, Raynolds, and Paladino) lack standing to assert claims against Stronach, because they do not allege ever having cast a bet through Stronach's ADW platform, XpressBet. (ECF No. 80-1 at 2.) In response, Plaintiffs argue that Stronach's control permeates the alleged scheme, as Stronach owns a sizeable chunk of the betting ecosystem: "a totalizator company

(AmTote), various ADW platforms (XPressbet, 1/st Bet), rights and signal distribution (1/st Content), numerous racetracks (Santa Anita, Gulfstream, Laurel Park); and a CAW platform (80% of Elite)." (FAC at ¶ 99; ECF No. 80-5 at 2.) More concretely, Plaintiffs note that "Elite's CAW players do not bet exclusively at Stronach-owned tracks"; they "bet into pari-mutuel pools at tracks throughout the country." (ECF No. 80-5 at 2–3.) The "central mechanism of injury," according to Plaintiffs, is that "Elite's players, operating with preferential access, timing advantages, informational advantages, and lower effective takeout, bet into the same pools in which Plaintiffs wagered—regardless of which platform Plaintiffs used to place their bets." (*Id.* at 3.)

Although neither side frames it as such, it turns out there is a fundamental dispute about what Article III traceability requires. Stronach contends that Plaintiffs need to have placed bets directly through Stronach's ADW platform, in other words, that need to have interacted with Stronach directly. Plaintiffs contend that it is enough that their bets end up in the same *pools* as Stronach's CAWs, even if the actual ADW platform through which they placed their bets was not connected to Stronach.

The Court need not decide which of those legal theories is correct. Even on Plaintiffs' more liberal theory of "common pool" standing, the FAC fails because nowhere does the FAC allege a specific instance when a Plaintiff's bet and an Insider's illicit CAW bet ended up in the same pool. This is fatal to standing. In *Collins v. Ne. Grocery, Inc.*, pension fund beneficiaries sued the plan sponsor under ERISA for, *inter alia*, acting imprudently by permitting the plan's recordkeeper, Fidelity, "to receive excessive compensation through funds with a revenue sharing scheme that indirectly compensated Fidelity." 149 F.4th 163, 173–74 (2d Cir. 2025). The Second Circuit held that the plan beneficiaries lacked standing, because they "did not plead that

they were individually harmed by Defendants' failure to monitor the revenue sharing scheme." *Id.* The complaint identified only one fund from which assets were improperly diverted to Fidelity, but "did not allege that any Plaintiff invested in that fund or, in a non-conclusory fashion, that any Plaintiff invested in any other fund with revenue sharing." *Id.* The complaint "thus did not allege any injury to any Plaintiff arising from the failure to monitor[.]" *Id.* So too here.

Accordingly, the claims of Plaintiffs Dickey, Monnin, Raynolds, and Paladino against Stronach should be dismissed for lack of standing.

#### *5. RGS Challenges Standing of All Plaintiffs*

Defendant Racing and Gaming Services (St. Kitts) Ltd. ("RGS") argues that Plaintiffs do not have standing to pursue claims against it because no Plaintiff is alleged to have interacted with RGS. (ECF No. 81-1.) Indeed, the FAC contains almost no allegations pertaining to RGS. (*See generally* FAC.) RGS is correct that the sparse allegations against it are insufficient to establish standing. No Plaintiff is alleged to have interacted with RGS, and no misstatement is attributed to RGS. As such, all claims against RGS should be dismissed.

#### *6. Stronach Challenges Standing, Alleging Plaintiffs Fail to Plead any Injury*

Stronach argues that *no* Plaintiff has standing to sue it, because Plaintiffs were not harmed by the alleged 2.5% increase in effective takeout. (ECF No. 80-1.) First, Stronach contends that the FAC "mischaracterizes" the Elite Letter as conveying a statement of fact when it actually only conveyed a hypothetical scenario. (*Id.* at 3.) That is spurious—Elite chose the numbers in the hypothetical to model a real-life racetrack.

Next, Stronach contends that "the FAC does not (and cannot) allege that Plaintiffs were deprived of money or property through any different takeout rate or payout formula." (ECF No.

80-1 at 3.) In particular, Stronach notes that "Plaintiffs do not allege that racetracks vary their takeout based on the identities of the bettors in the pools, or that a CAW winner would receive a larger pro rata payout than a retail winner in the same pool." (*Id.*) That observation is true, as far as it goes. Stronach is also correct that Plaintiffs' injury has nothing to do with rebates: "Plaintiffs do not and cannot allege that rebates to CAW players reduce in any way what Plaintiffs win." (*Id.* at 4 (emphasis removed).)

Nevertheless, the Elite Letter speaks for itself. It is about win *rates*, that is, expected return. The Letter is not about the odds of winning or losing on any particular horse, but rather in the aggregate. CAWs have a higher win rate than retail bettors, so they achieve higher aggregate returns. And because pari-mutuel betting is a zero-sum game, that extra return has to come from somewhere. Hence, the "effective" takeout for ordinary bettors is increased by 2.5%. As such, Plaintiffs' core theory of harm remains: the participation of CAWs does harm retail investors.

Accordingly, this argument by Stronach fails.[9]

To summarize: All claims by all Plaintiffs against all Defendants should be dismissed both for lack of injury in fact (*supra*, § I.A.) and lack of traceability (*supra*, § I.B.). Should the District Judge disagree with this conclusion, certain individual Plaintiffs and Defendants should be dismissed regardless. Specifically, dismissal is appropriate as to: (1) all Plaintiffs' claims against RGS; (2) all Plaintiffs' claims against NYRA, *except* Seevers's; (3) Dickey, Monnin, Raynolds, and Paladino's claims against Stronach; and (4) Zelen's claims against the Churchill Downs Defendants. Such dismissal would be without prejudice. *Whole Foods*, 858 F.3d at 735 (explaining that dismissal for lack of Article III standing is without prejudice).

---

[9] Stronach's remaining arguments concern the falsity, or lack thereof, of its statements. The reader is directed to § II.B for this analysis.

The Court now turns to the merits. As will be explained, Plaintiffs fail to state a claim as to all fourteen causes of action. The undersigned therefore respectfully recommends that the FAC be dismissed *with* prejudice.

## II. RICO

"RICO provides a civil remedy to persons injured in their business or property by a violation of the statute." *Alkhatib v. New York Motor Grp. LLC*, No. CV-13-2337 ARR, 2015 WL 3507340, at *8 (E.D.N.Y. June 3, 2015), *report and recommendation adopted in part*, No. 13CV2337 (ARR)(SMG), 2016 WL 5660372 (E.D.N.Y. Sept. 30, 2016) (citing 18 U.S.C. § 1964(c)); *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) ("*Satinwood*") (quoting 18 U.S.C. § 1962(c)). Plaintiffs assert RICO and RICO conspiracy claims pursuant to 18 U.S.C. §§ 1962(c) and (d) against all Defendants.

"To state a claim under 18 U.S.C. § 1962(c), one of RICO's substantive provisions, a plaintiff must plead four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 665 (2d Cir. 2014) (summary order) (internal citation omitted). "A defendant may be liable for violating RICO if the defendant, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in the affairs of an enterprise involved in interstate commerce." *Alkhatib*, 2015 WL 3507340, at *8.

### A. RICO Enterprise

"A RICO enterprise 'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Alkhatib,* 2015 WL 3507340, at *9 (quoting 18 U.S.C. § 1961(4)). "An 'association-in-fact' enterprise must have 'at least three structural features: a purpose, relationships among those

associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Id.* (quoting *Boyle v. United States,* 556 U.S. 938, 956 (2009)); *see also United States v. Turkette,* 452 U.S. 576, 583 (1981) (an enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct.").

The Supreme Court's decision in *Boyle* "establishes a low threshold for pleading such an enterprise." *Delgado v. Ocwen Loan Servicing, LLC,* 2014 WL 4773991, at *16 (E.D.N.Y. Sept.24, 2014) (internal citations omitted). "Formal hierarchy, role differentiation, regular meetings, or established procedures are not required; rather, an informal group may constitute an enterprise as long as 'the group ... function[s] as a continuing unit and remain[s] in existence long enough to pursue a course of conduct.'" *Alkhatib*, 2015 WL 3507340, at *9 (quoting *Boyle,* 556 U.S. at 948).

Here, Plaintiffs allege that Defendants participated in a RICO enterprise through an illegal "Pool Rigging Enterprise." (FAC ¶¶ 103–104.) Plaintiffs allege that each Defendant was a member of this enterprise and facilitated the Insider Betting Group's ability to manipulate betting pools and reap profits that otherwise would have been distributed to ordinary bettors. (*Id.* ¶ 106.) Plaintiffs further allege that each Defendant exercised control over some aspect of horse-betting operations and therefore played a role in the enterprise's ongoing operation. (*Id.* ¶¶ 105-15.) According to the Complaint, the members of the enterprise shared the purpose of increasing profits through the preferential treatment afforded to the Insider Betting Group. (*Id.* ¶ 116.)

Plaintiffs' theory is hamstrung by the fact that most of the members of the alleged enterprise are direct competitors: Stronach, Churchill Downs, and NYRA compete with each other in the racetrack industry; AmTote and United Tote compete with each other as the two dominant totalizers; and Elite and RGS compete with each other as two of the three dominant

CAWs. The suggestion that direct competitors are secretly working in concert to rig the market is an extraordinary claim, and extraordinary claims require extraordinary substantiation. *Cf. Env't Servs., Inc. v. Recycle Green Servs., Inc.*, 7 F. Supp. 3d 260, 272–73 (E.D.N.Y. 2014) (finding RICO enterprise amongst competitors where GPS data, photographs, and identical customer termination letters evidenced coordinated conduct).

To be sure, not *all* of the Defendants are in competition with one another. There is some vertical integration as well: Stronach owns AmTote; Churchill Downs and NYRA share United Tote; and Stronach and NYRA share Elite. So, to the extent NYRA shares subsidiaries with both Churchill Downs and Stronach, it is not entirely farfetched to suggest they had opportunity and motive to conspire. Still, the FAC falls woefully short of connecting these dots. Although the *Boyle* standards allow for murkiness between ordinary business and an enterprise, "allegations or a 'bare bones statement' of conspiracy will not withstand a motion to dismiss, and sufficient facts must be alleged to allow the defendant to form a response." *United States v. Priv. Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 793 F. Supp. 1114, 1146 (E.D.N.Y. 1992) (quoting Wright & Miller at § 1233); *Boyle*, 556 U.S. at 129. Plaintiffs do not identify specific acts showing that Defendants coordinated with one another to operate the alleged Pool Rigging Enterprise. *Priv. Sanitation Indus. Ass'n of Nassau/Suffolk*, 793 F. Supp. at 1146 (holding that the complaint must be "specific enough to identify individual defendants with individual acts"); *see also Env't Servs., Inc.*, 7 F. Supp. 3d at 272–73.

Because a RICO enterprise is an essential element of a RICO claim, this deficiency invalidates Plaintiffs' RICO claim as a whole. *See D. Penguin*, 587 F. App'x at 668–69 (affirming dismissal of RICO claim where plaintiffs failed to sufficiently plead the existence of an enterprise).

**B. Pattern of Racketeering Activity**

Racketeering activity is defined as:

> "(A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical ... which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code[,]" including 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

*Jordan v. Pierre*, No. 18-CV-8528 (JGK), 2021 WL 2581444, at *3 (quoting 18 U.S.C. § 1961(1)).

A "pattern of racketeering activity" requires at least two predicate acts of racketeering activity enumerated in § 1961(1) and (2) committed within a ten-year period. 18 U.S.C. § 1961(5); *Alkhatib*, 2015 WL 3507340 at *11; *GICC Cap. Corp. v. Tech. Fin. Grp.*, 67 F.3d 463, 465 (2d Cir. 1995). Predicate acts are comprised of at least two racketeering activities, both related to each other and proximate to the enterprise that an enterprise member engages in. *U.S. v. Delgado*, 972 F.3d 63, 79 (2d Cir. 2020).

*1. Scheme to Defraud*

The scheme to defraud is a question of a fair and civil exchange (or lack thereof) in business transactions; the monies or property at the center of the scheme must be the victim's own; and the use of wires or mail must further the fraudulent scheme "as conceived by the perpetrator at the time." *Bayshore Capital Advisors, LLC v. Creative Wealth Media Finance Corp.*, 667 F.Supp.3d 83, 124-25 (S.D.N.Y. 2023) (internal quotations and citations omitted). This standard is "nontechnical," relying instead on "moral uprightness…fundamental honesty, fair play and right dealing in the general and business life of members of society." *Id.* at 124 (quoting *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018)). The scheme to defraud is the core element of a mail or wire fraud inquiry, requiring "a plan to

deprive a person of something of value by trick, deceit, chicane or overreaching." *Williams v. Affinion Grp.*, LLC, 889 F.3d 116, 124 (2d Cir. 2018) (quoting *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)).

"Importantly, RICO claims alleging fraudulent predicate acts 'are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which requires that averments of fraud be stated with particularity.'" *Bayshore*, 667 F. Supp. 3d at 125 (citation modified) (quoting *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013)). "In the context of a civil RICO claim, 'all allegations of fraudulent predicate acts are subject to the heightened pleading requirement of Rule 9(b).'" *Id.* (citation modified) (quoting *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004)). This means that "[a]llegations of predicate mail and wire fraud acts" must not only "state the contents of the communications," but also, *inter alia*, "explain why they were fraudulent." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (internal citation omitted).

Here, Plaintiffs allege in broad strokes that the fraudulent scheme to defraud ordinary bettors for their financial gain was systematic and coordinated, with each Defendant contributing to a scheme that advantages the Insider Betting Group by giving the insiders lower takeout rates, access to CAWs for increased speed and pool manipulation, and insider information access. (*See* FAC ¶¶ 64- 87.) Defendants allegedly coordinated these advantages in their synchronized management of price setting, rule setting, control of when bets can stop coming in, pool betting access, betting platforms, high-volume bettor hubs, and CAWs. (*Id.* at ¶¶ 78- 86.) Plaintiffs allege that Defendants participated in the scheme while "h[olding] themselves out as participating in and running fair pari-mutuel betting pools where all participants are on equal footing." (ECF No. 77-1 at 20-21.)

Plaintiffs fails to state a predicate act of fraud for a very simple reason: no Defendant is alleged to have said anything fraudulent. Plaintiffs identify several allegedly misleading statements in support of their mail and wire fraud theory. (ECF No. 77-2 at 21.) Specifically, Plaintiffs point to the above discussed statements of Scott Daruty, President of Elite Turf Club, who reportedly stated that "the game is fair" and that CAWs do not receive preferential treatment. (*Id.* (stating that there is "one and only one data feed.").) Plaintiffs point to a 2023 consumer guide published by Defendant Churchill Downs stating that bettors are "wagering against each other" rather than against the track. (*Id.*) Plaintiffs also highlight the Stronach Group's statement that "[a]ll participation in CAW is subject to the same pool rules, tote system audits and state regulatory approvals that govern all other forms of wagering" and that "claims that CAWs receive an unfair advantage are unfounded." (FAC ¶ 93.)

According to Plaintiffs, these statements concealed the advantages afforded to members of the Insider Betting Group and created the false impression that the betting pools operated as a truly pari-mutuel system. (*Id.*) Defendants knew otherwise, as Defendant Elite admitted that the presence of the Insider Betting Group lowers the effective takeout for ordinary bettors by approximately 2.5%. (ECF 77-2 at 2-3.) Furthermore, new restrictions or bans on CAW activity that limit the pool manipulation by Insider Betting Groups are alleged to be admission that the previous restrictions were not fair or transparent. (FAC ¶¶ 141-143; ECF 77-2 at 3 (stating that Defendants cited the goals of "[r]educ[ed] odds volatility" and "increase[d] pricing transparency" for its rule changes regarding CAW).) And Plaintiffs allege that each of the Defendants economically benefit from the scheme through increased takeout, increased betting handle at the racetracks, and increased revenues. (FAC ¶¶ 87-90.)

These statements properly allege (1) the specific content or statements of the alleged fraudulent communication, (2) the speaker, (3) where and when the statements were made. *See Spool*, 520 F.3d at 185. However, the FAC critically must allege (4) *why* the content or statement is fraudulent. *Id.* As Defendants correctly note, "'opinions and puffery or ultimately unfulfilled promises' are not actionable as fraud." *Nelson v. Publishers Circulation Fulfillment, Inc.*, No. 11 CIV. 1182 TPG, 2012 WL 760335, at *4 (S.D.N.Y. Mar. 7, 2012) (quoting *Jacobs v. Lewis*, 261 A.D.2d 127 (1st Dep't 1999)). Statements calling the betting pool "fair" are quintessential "non-actionable puffery, opinions, or promises." *Id.*

Next, Plaintiffs challenge the statement that "[a]ll participation in CAW is subject to the same pool rules, tote system audits and state regulatory approvals[.]" (FAC ¶ 93.) This was misleading, according to Plaintiffs, because in reality the Insider Betting Group "are granted special terms and access to betting pools." (*Id.* at ¶ 11.) Plaintiffs allege that members of the Insider Betting Group receive price advantages, special access to betting pools, and informational advantages unavailable to ordinary bettors. (*Id.*; *see also id.* at ¶¶ 13-14.) But none of those purported facts are inconsistent with the representation that all participants are subject to the same rules, audits, and regulatory approvals. As Defendants correctly observe in their omnibus motion to dismiss, "Plaintiffs do not allege there are a different set of rules or regulations for wagerers who use CAW." (ECF No. 77-1 at 20–21.)

Plaintiffs take aim at a 2018 statement by Belinda Stronach, the chairwoman, CEO, and president of Defendant The Stronach Group, that "a big, big focus for us [The Stronach Group is] to make sure we can simplify wagering whether it's on track or off track." (*Id.* at ¶ 94.) This is aspirational, opinion, and not even alleged to be false.

Plaintiffs next point to a 2023 statement by Scott Daruty, President of Defendant Elite Turf Club, that "[i]t's got to be good for everyone to make sure this succeeds in the long run." (*Id.* at ¶ 98.) This is classic puffery and it is aspirational. Daruty further stated, "People need to have confidence that the game is fair. Knowing what I know, and seeing it day in and day out, I have every belief and every confidence that the game is fair." (*Id.*) This is expressly framed as an opinion, and it is puffery regardless. *See Olson v. Major League Baseball*, 29 F.4th 59, 74 (2d Cir. 2022) (holding statement that fantasy baseball is a "game of skill" to be non-actionable opinion).

Plaintiffs also take issue with the statement by Defendant Churchill Downs that, in a pari-mutuel betting system, "[i]nstead of betting against the race track, horseracing bettors are wagering against each other." (*Id.* at ¶ 95.) This is true, and Plaintiffs say so themselves. (*See id.* at ¶ 98 ("This system is unlike a typical sports bet where you make a bet against the sportsbook . . . . But in a pari-mutuel system, the bettor is betting against all other bettors[.]").

Next, Plaintiffs point to a statement by The Stronach Group that "claims that CAWs receive an unfair advantage are unfounded." (FAC ¶ 93.) This is a classic statement of opinion. *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 757 (S.D.N.Y. 2018) (finding statement that "there was no merit to Delta's lawsuit" inactionable opinion); *see also Dang v. Amarin Corp. plc*, 750 F. Supp. 3d 431, 462 (D.N.J. 2024) ("[S]tatements regarding the viability of the lawsuits ... clearly constitute opinions regarding the success of the litigation, rather than statements of fact.") (ellipses in original; internal citation omitted).

Only one statement by Defendants was concrete enough to plausibly be misleading: Daruty's claim that "there's one and only one data feed[.]" (FAC ¶ 98.) This could be untrue in light of the FAC's allegation that Insiders "connect directly via the wires and mails to the

totalizer system through dedicated, low-latency links[,]" which gives them, *inter alia*, "[r]eal-time access to pool data, odds, and probables [*sic*][.]" (*Id.* ¶ 72; *see also id.* ¶ 86 (alleging that Insiders "connect by API to the AmTote hub").) If the Insiders receive an informational advantage from Defendants that is unavailable to others, then it is not true that there is "one and only one data feed." However, on balance this is too thin a reed. The FAC does not elaborate on these "dedicated" links and API connections. Without more information, the Court cannot conclude that they constitute "data feeds" as Daruty used that term. In fact, the FAC does not even clearly allege that this advantage came from Defendants; it is equally possible that the Insiders paid for this infrastructure themselves. This reading is bolstered by the fact that the FAC lumps these allegations together with other supposed "advantages" to the Insiders which clearly have nothing to do with Defendants—*e.g.*, the fact that Insiders "monitor live odds across pools" or "ingest every pool's totals/will-pays programmatically[.]" (FAC ¶¶ 85–91.) To the extent Plaintiffs are frustrated that they cannot compete against those with more expensive computer infrastructure, their quarrel is not with Defendants or even with pari-mutuel betting. Their quarrel is with capitalism itself. *See, e.g.*, MICHAEL LEWIS, FLASH BOYS (2014); SCOTT PATTERSON, DARK POOLS (2013). Hence, the statement "there's one and only one data feed" is not adequately alleged to be false. [10]

In sum, because no Defendant said anything misleading, Plaintiffs' RICO claim predicated on fraud must fail. *See Spool*, 520 F.3d at 185 (affirming dismissal of RICO claim

---

[10] The parties also quibble over the FAC's claim that Daruty asserted that CAWs do not receive preferential treatment. (FAC ¶ 98; *see* ECF No. 80-5 at 7.) But the FAC does not allege that Daruty actually said that. There are no quotation marks, indicating that it is a paraphrase. Obviously, this does not satisfy Rule 9(b)'s particularity requirement, as it does not "state the contents of the communications[.]" *Spool*, 520 F.3d at 185.

predicated on alleged fraud, because the complaint did not allege any fraudulent communications with requisite particularity).[11]

2. *Churchill Downs Does Not Make any Misrepresentations*

Individually, the Churchill Down Defendants argue that Plaintiffs fail to state a claim against them because they did not make any misrepresentations. (ECF No. 78-1 at 7.) Specifically, the FAC attributes one statement to the Churchill Down Defendants: "instead of betting against the race track, horseracing bettors are wagering against each other[.]" (FAC at ¶ 95.) Plaintiffs appear to concede that this statement is "literally true in isolation," but they argue that it is nonetheless misleading because it omits that the betting is unfairly tilted in favor of the Insider Betting Group. (ECF No. 78-2 at 7-8.) But the so-called "half-truths" doctrine goes only so far. The statement was not ambiguous, strategic, or otherwise misleading by omission. It is simply true. Even though the Insider Betting Group wager at much higher volumes and speeds than retail bettors, the fact remains that they are fellow horseracing bettors, *not* the racetrack. (ECF No. 78-1 at 7-8.); *see supra*. Nor do Plaintiffs plead any sort of fiduciary relationship of trust that might create a heightened duty of candor. Thus, the Churchill Down Defendants are correct that they made no actionable misrepresentations.

**C. RICO Standing: Injury and Proximate Causation**

For a plaintiff to have standing to pursue RICO claims, the RICO violation must be the proximate cause of the plaintiff's injury, meaning there was a direct relation between the purported injury and supposed misconduct. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992); *Nygard v. Bacon*, No. 19-CV-1559 (LGS)(KNF), 2021 WL 4312581, at *10

[11] With respect to three of the alleged misstatements, there is another, more glaring reason they are inactionable: they were uttered after this action was filed. (*See* FAC at ¶¶ 93 ("same pool rules, tote system audits and state regulatory approvals"; "claims that CAWs receive an unfair advantage are unfounded"), 98 ("there's one and only one data feed").)

(S.D.N.Y. Mar. 31, 2021); *In re Conte*, at *32-33. Moreover, the RICO violation must be the but-for cause of the injury, "meaning that but for the RICO violation, he would not have been injured." *Zou v. Han*, No. 23-CV-02370 (JMA) (JMW), 2024 WL 4450781 at *17 (E.D.N.Y. 2024) (quoting *Alix v. McKinsey & Co.*, 23 F.4th 196, 203 (2d Cir. 2022)).

*a. Injury*

At the crux of this claim is whether the Plaintiffs adequately plead an injury that is proximately caused by the illegal "Pool Rigging Enterprise." The Plaintiffs must demonstrate that they were "injured in [their] business or property by reason of a violation of section 1962." *Holmes*, 503 U.S. at 265. Plaintiffs allege that their injury consists of the money diverted to the Insider Betting Group through the enterprise's scheme to confer betting advantages on that group. (ECF No. 77-2 at 14-16.) Defendants respond that Plaintiffs received exactly what they bargained for, namely a non-guaranteed opportunity to win their wagers, and therefore have failed to identify any concrete monetary loss. (ECF 77-1 at 15.)

The 2.5% figure describes an alleged systemic effect on retail bettors, but the First Amended Complaint never alleges facts showing that this effect translated into an actual loss of money belonging to any named Plaintiff. (FAC ¶ 140.) And the Plaintiffs repeatedly state that the harms are "calculable," but offer no calculations as to how much of Plaintiffs' winnings were improperly lost. (*See generally* FAC.) A plaintiff must allege a concrete financial loss to his own business or property that was directly caused by the alleged RICO violation. *See Zou*, 2024 WL 4450781, at *16–17. Under Plaintiffs' theory of injury, therefore, Plaintiffs would have to allege that they won wagers and that their payouts were reduced by the alleged scheme. *See id.*

As demonstrated in the Article III standing analysis above, Plaintiffs fail to plead an economic injury that is not merely theoretical. That deficiency is also fatal to RICO standing because § 1964(c) requires injury to the plaintiff's own business or property. *See Zou*, 2024 WL

4450781, at *16–17; *Holmes*, 503 U.S. at 265. Plaintiffs allege generally that they "incurred financial losses" from Defendants' alleged scheme, but do not allege any wagers on which they won and received a diminished payout. (*See generally* FAC.) Thus, as in *Zou*, Plaintiffs fail to connect the alleged RICO violation to a concrete financial loss to their own property. *See Zou*, 2024 WL 4450781, at *16–17.

*b. Proximate Cause*

To establish RICO standing, a plaintiff must demonstrate not only factual causation but also some direct relation between the injury asserted and the conduct alleged. *Holmes*, 503 U.S. at 268. Defendants argue that Plaintiffs' injuries are the result of the actions of "independent market actors." (ECF No. 77-1 at 16.) In support, Defendants analogize this case to situations in which alleged economic harm results from the actions of independent market participants rather than directly from a defendant's misconduct. *See In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 119 (S.D.N.Y. 2021) (holding that the buy/sell decisions of independent market actors led to the purported economic harm).

Although Plaintiffs allege that Defendants provided the Insider Betting Group with advantages that distorted wagering outcomes, the losses allegedly suffered by ordinary bettors depended upon the subsequent betting decisions and wagering activity of members of the Insider Betting Group. (ECF No. 77-2 at 17-18.) The challenged conduct did not itself transfer money from Plaintiffs to Defendants. *See In re Tether*, 576 F. Supp. 3d at 119; (ECF No. 77-1 at 16.) Rather, any reduction in Plaintiffs' winnings occurred only after independent bettors placed wagers and competed for shares of the betting pools. *See In re Tether*, 576 F. Supp. 3d at 119; (ECF No. 77-1 at 17.)

As a result, the causal chain between Defendants' conduct and Plaintiffs' alleged injury is mediated by the actions of third parties. *See In re Tether*, 576 F. Supp. 3d at 119. Ultimately,

Plaintiffs' claimed injuries are "purely contingent" upon the actions of the independent market actors of those in the Insider Betting Group. *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, 771 F. App'x 498, 504 (2d Cir. 2019). As such, the Court cannot conclude that "but for the RICO violation, [the Plaintiffs] would not have been injured." *Zou*, 2024 WL 4450781 at *17 (quoting *Alix*, 23 F.4th at 203). The relationship between the purported RICO violation and Plaintiffs' economic losses is too attenuated to satisfy RICO's proximate-causation requirement. *Id.* Accordingly, Plaintiffs lack RICO standing.

**D. Alternate Predicate Act: Illegal Gambling**

As set forth in the Illegal Gambling Business Act, an illegal gambling business is one in which there "(i) is a violation of the law of a State or political subdivision in which it is conducted; (ii) involves five or more persons … and (iii) has been or remains in substantially continuous operation." *United States v. DiCristina*, 726 F.3d 92, 97 (2d Cir. 2013) (quoting 18 U.S.C.A. § 1955). Plaintiffs allege that the pari-mutuel betting system became an illegal gambling system as a result of the advantages conferred upon the Insider Betting Group. (FAC ¶ 10.) The Plaintiffs allege that although pari-mutuel betting is legal, the systems in question are no longer pari-mutuel betting pools due to the tilted odds and volatility of the pool. (*Id.* at ¶ 152.) Plaintiffs do not cite any case law to bolster this allegation. (*See* ECF No. 77-2 at 24-25.)

Defendants argue that the absence of any claimed state law violations undermines Plaintiffs' illegal betting claim under the precedent of an Eighth Circuit case on horse-betting, which held that "the particular state statute alleged to have been violated is an essential and substantive element of a violation of 18 U.S.C. section 1955." *United States v. Miller*, 774 F.2d 883, 885 (8th Cir. 1985) (reversing conviction where indictment failed to cite the state statute alleged to have been violated). Plaintiffs attempt to distinguish *Miller*, urging that the problem

there was not merely the indictment's failure to specify the statute allegedly violated; it was the failure to specify the statute *or* describe the activities underlying the charge. (ECF No. 77-2 at 25.) One or the other, according to Plaintiffs, is enough; hence the FAC, despite not citing a violation of a particular statute, states a claim because it specifies the charged activity. (*Id.*)

Plaintiffs' reading of *Miller* may be correct. But it does not save the FAC, because the FAC does not specify the charged activity either. The basis of *Miller* was a Supreme Court case called *Hamling*, where the Court emphasized that an indictment must "contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against him which he must defend," which can be accomplished by "set[ting] forth all the elements necessary to constitute the offense intended to be punished." *Miller*, 774 F.2d at 884–85 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). Here, Plaintiffs' bald conclusion that the pari-mutuel pools became "structurally tilted wagering markets to benefit [Defendants]" (ECF No. 77-2 at 24) does neither. The problem is not simply that the FAC does not cite to a particular provision of a particular state's legal code. The problem is more fundamentally that the *facts* alleged in the FAC do not, to the Court's knowledge, constitute a violation of any state's law.

In the alternative, Plaintiffs argue that even without violating any particular state statute or regulation, "Defendants' gambling business is itself illegal" because "state-law authorization for horse-race wagering depends on the wagering remaining genuine pari-mutuel betting: a common pool in which bettors compete against one another under the same rules." (ECF No. 77-2 at 24 (citing Cal. Bus. & Prof. Code § 19590).) The structural advantages enjoyed by Insiders—rebates, direct connections to totalizer systems, lower effective takeout rates, etc.—contort the game beyond recognition, according to Plaintiffs. (*Id.* at 25.) Because CAWs and retail bettors do not compete on "equal footing," "Defendants' pools were not genuine pari-

mutuel pools and therefore were not protected by the state-law exceptions" to gambling prohibitions. (*Id.*)

Plaintiffs cite neither caselaw nor statute to support the proposition that unfairness of the sort described in the FAC alters the nature of the game at such a fundamental level that it ceases to be a pari-mutuel arrangement. Section 1955 identifies "gambling" to include certain games of chance, and New York law, in turn, defines a "contest of chance" as "any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein.'" *DiCristina*, 726 F.3d at 98. As Plaintiffs concede, in a standard pari-mutuel betting pool, "the posted odds at the time you made your bet are not the odds that you may wind up with for your bet." (FAC ¶ 49.) And, to reiterate, the FAC does not allege that anyone cheated; that different substantive rules or audits applied to different groups of bettors; that rebates to Insiders were stolen directly from Plaintiffs' pockets; or that Defendants furnished Insiders with nonpublic information. Generalized gripes about fluctuating odds and preferential treatment do not themselves turn the game into anything other than what it is: a pari-mutuel system. Accordingly, even accepting Plaintiffs' allegations concerning the effect of the Insider Betting Group on the betting pools, Plaintiffs have not plausibly alleged an illegal gambling business within the meaning of § 1955.

**E. Whether the RICO Claim Against NYRA is Timely**

NYRA argues that Plaintiffs' RICO claim is time-barred. The parties agree that the statute of limitations on a RICO claim is four years. (ECF No. 79-1 at 7; ECF No. 79-2 at 6.) The Second Circuit has explained that this four-year period begins "once there are sufficient 'storm warnings' to trigger the duty to inquire[.]" *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 153 (2d Cir. 2012). Here, the FAC alleges that Plaintiff Dickey has been wagering on horse races for more than 15 years, CAW has existed since the late 1980's, and high-volume players

have been incentivized with rebates since the mid-1990's. (FAC at ¶¶ 16, 59.) Plaintiffs deflect that although they were aware that CAW existed generally, they were unaware "that Defendants allegedly used preferential access, pricing, and information to manipulate pari-mutuel pools at Plaintiffs' expense." (ECF No. 79-2.) This distinction does not hold water. As discussed above, the FAC does not allege with any particularity how Defendants gave the Insiders "preferential access" or "information"; those advantages might be the result of the Insiders' own investments in advanced computer infrastructure and market research. The only allegation that ties the Insiders' advantage to Defendants' actions is the rebate system, which by Elite's own admission raises the effective takeout for retail bettors by 2.5%. But Plaintiffs admit that such rebates have been provided since the 1990's. (FAC at ¶ 59.) Accordingly, Plaintiffs could have brought this RICO conspiracy claim long ago.

In the alternative, Plaintiffs argue that even if they discovered their injuries more than four years before filing suit, each new wager cast is a new injury giving rise to a fresh four-year limitations period. (ECF No. 79-2 at 6.) In support, they cite the "separate accrual" rule from *Bingham v. Zolt*, which held that a new four-year limitations period accrued with each new civil RICO cause of action. 66 F.3d 553, 561 (2d Cir. 1995). But *Bingham* is inapposite. There, the new cause of action was triggered by the separate acts of the *defendants*: "A variety of schemes were employed, involving frequent misappropriations of discrete amounts of money from different sources, . . . and each illegal diversion constituted a new and independent legally cognizable injury to the estate." *Id.* Here, the entire theme of the FAC is to treat all Defendants and all actions related to horse-betting as an inseparable monolith, with each participant contributing to an ongoing, cohesive scheme. Plaintiffs offer no support for their invocation of

the separate accrual rule based on the separate acts of *plaintiffs*—*i.e.*, that each new wager cast into the rigged system gives rise to a "new civil RICO cause of action[,]" in *Bingham*'s words.

Accordingly, Plaintiffs' RICO claim is time-barred.[12]

## III. State Law Claims

### A. California Claim

Plaintiff Seevers on behalf of the class asserts four claims under California law: the Unfair Competition Law ("UCL"), California Civil Code § 1709, the False Advertising Law ("FAL"), and the Consumer Legal Remedies Act ("CLRA"). As will be explained below, these claims—like the other Plaintiffs' claims under Pennsylvania, Illinois, Florida, Ohio, Colorado, and New York law—all rise and fall on the same basic analysis above regarding RICO. If nothing any Defendant said was untrue, then no Plaintiff can state a claim sounding in fraud. And even if some statement was untrue, if no Plaintiff relied on those statements or was otherwise proximately harmed thereby, the claim must fail regardless.

The UCL protects against any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. "The UCL 'borrows' violations from other laws by making them independently actionable as unfair competitive practices." *Quintanilla v. WW Int'l, Inc.*, 541 F. Supp. 3d 331, 344 (S.D.N.Y. 2021); *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 682 (S.D.N.Y. 2017).

"For example, 'any violation of the [FAL] necessarily violates the UCL.' " *Id.* (quoting *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 119 Cal.Rptr.2d 296, 45 P.3d 243, 250 (2002)). Where a UCL claim is premised on allegedly deceptive representations, the claim is governed by the reasonable-consumer standard. *See Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir.

[12] It is not clear why NYRA raises this argument independently. It would seem to be applicable to all Defendants.

2008). Under that standard, a plaintiff must establish that members of the public are likely to be deceived. *Id.* The standard requires more than a mere possibility that a representation could be misunderstood by a small number of consumers acting unreasonably; rather, there must be a probability that a significant portion of the general consuming public or targeted consumers, acting reasonably under the circumstances, could be misled. *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016). To establish standing under the UCL, a private plaintiff must demonstrate that he or she suffered an injury in fact and lost money or property because of the challenged conduct. *Jarvis v. State Farm Gen. Ins. Co.,* No. EDCV 24-1141 JGB (SPX), 2024 WL 4003319 (C.D. Cal. July 26, 2024). Accordingly, a plaintiff must establish both an economic injury and a causal connection between that injury and the allegedly unfair business practice. *Id.*

The CLRA states, "[t]he unfair methods of competition and unfair or deceptive acts or practices listed in this subdivision undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful." Cal. Civ. Code § 1770. Like claims alleging deceptive conduct under the UCL and FAL, CLRA claims based on allegedly misleading representations are evaluated under the reasonable-consumer standard. *Williams*, 552 F.3d at 938. A plaintiff therefore must plausibly establish more than a possibility that some consumers might misunderstand the challenged representation; rather, there must be a probability that a significant portion of the general consuming public or targeted consumers, acting reasonably under the circumstances, could be misled. *Ebner*, 838 F.3d at 965; *see also McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097 (9th Cir. 2023).

The False Advertising Law prohibits any "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. and Prof. Code § 17500. "'[A]ny violation of the false advertising law ... necessarily violates' the DUCL." *Kasky v. Nike, Inc.* 27 Cal.4th 939, 950, 119 Cal.Rptr.2d 296,

45 P.3d 243 (2002) (quoting *Comm. on Children's Television, Inc. v. General Foods Corp.,* 35 Cal.3d 197, 210, 197 Cal.Rptr. 783, 673 P.2d 660 (1983)).

All three of these statutes are governed by the "reasonable consumer" test. *Williams v. Gerber Prods. Co.,* 552 F.3d 934 (9th Cir. 2008); *Freeman v. Time, Inc.,* 68 F.3d 285, 289 (9th Cir.1995) ("[T]he false or misleading advertising and unfair business practices claim must be evaluated from the vantage of a reasonable consumer." (citation omitted)); *Lavie v. Procter & Gamble Co.,* 105 Cal.App.4th 496, 506–07 (Cal.App.2003) ("[U]nless the advertisement targets a particular disadvantaged or vulnerable group, it is judged by the effect it would have on a reasonable consumer.").

Finally, California Civil Code § 1709 provides that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Cal. Civ. Code § 1709. California courts treat a claim under § 1709 as an action for fraudulent deceit. "The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 909 P.2d 981 (1996) ; *Hunter v. Up-Right, Inc.,* 6 Cal. 4th 1174, 864 P.2d 88 (1993). "Each element must be alleged with particularity." *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1060 141 Cal. Rptr. 3d 142 (2012).

Crucially, because Plaintiffs' claims sound in fraud, they are subject to the heightened pleading requirements of Rule 9(b), which means Plaintiffs must specifically allege "the who, what, when, where, and how" of the alleged misconduct. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).

Moreover, claims under these California statutes are evaluated under the reasonable consumer standard. *See Williams*, 552 F.3d at 938. Plaintiffs concede they knew that posted odds at the time one places a bet are likely to fluctuate thereafter. (FAC at ¶ 45.) Plaintiffs concede they were aware of the existence of computer-assisted wagering ("CAW"), a practice that has existed since at least the 1980s or 1990s. (*Id.* at ¶ 59.) Thus, Plaintiffs have not plausibly alleged that the challenged practices would deceive a reasonable consumer. *See Williams*, 552 F.3d at 938; *Freeman*, 68 F.3d at 289; *Lavie,* 105 Cal.App.4th at 506–07, 129. Plaintiffs' California state law claims should be dismissed.

Plaintiffs' UCL claim independently fails because Defendants' statements do not constitute actionable misrepresentations, as explained above (§ II.B.). *See Hammerling v. Google, LLC*, No. 22-17024, 2024 WL 937247 (9th Cir. Mar. 5, 2024) (affirming dismissal of UCL, FAL, CLRA, and fraud claims for failure to allege an actionable misrepresentation). Separately, Plaintiffs fail to plausibly allege that Defendants' statements would deceive a reasonable consumer. *See Shaeffer v. Califia Farms, LLC*, 44 Cal. App. 5th 1125, 1138 (2020) (holding that the facts alleged were insufficient to show that a reasonable consumer would be misled).

Plaintiffs' CLRA claim likewise fails for the reasons discussed above, *i.e.*, because Plaintiffs have not plausibly alleged that Defendants made a representation likely to deceive a reasonable consumer. *See McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097 (9th Cir. 2023) (recognizing that claims under the UCL, FAL, and CLRA are governed by the reasonable consumer standard). The FAL claim fails for the same reason. *See Bodenburg v. Apple Inc.*, 130 F.4th 657, 663–64 (9th Cir. 2025) (affirming dismissal of UCL, CLRA, and FAL claims where

the plaintiff failed to plausibly allege that the challenged representations would deceive a reasonable consumer).

Crucially, "[a]lthough reasonableness of reliance is generally a question for the jury, courts may resolve this issue as a question of law where no reasonable person could believe the type of misstatement alleged." *Olson v. Major League Baseball*, 29 F.4th 59, 77 (2d Cir. 2022). In *Olson*, the plaintiffs brought claims under common law and state consumer protection laws—including UCL and CLRA—against the MLB. The plaintiffs, who played fantasy baseball, asserted that the MLB's statement that fantasy baseball is a "game of skill" was fraudulent given baseball players' tendency to cheat. The Second Circuit rejected this contention out of hand, noting "the conclusion of numerous other courts around the nation that have found that fraud and related claims brought by disappointed sports fans—whether about poor performance or rule violations—cannot survive a motion to dismiss." *Id.* The court therefore affirmed dismissal of the claims, finding that "no reasonable consumer, not even an 'ignorant, unthinking, or credulous person,' could believe that there would be no rules violations in MLB baseball games notwithstanding any statements by participants to the contrary." *Id.* at 85 (internal citation omitted).

So too here, even assuming Defendants had said something untrue and even assuming Plaintiffs had heard that statement and relied on it, their reliance would not be "justifiable[.]" *Id.* at 77. No reasonable person engages in gambling thinking he will make money in the long run. This was always true, but it is all the more so true now, in the age of algorithmic finance. Plaintiffs act as though they only learned just now, in 2026, that financial markets are "rigged." But—setting aside the loaded and unhelpful characterization "rigged"—it has been the case since at least the early 2010s that retail traders do not stand a chance against sophisticated,

computerized traders who can, *inter alia*, execute thousands of trades per second. This is common knowledge. Even the most "credulous person," *id.* at 85, must be aware that financial markets are composed of sharks and minnows, and if you don't know which is which, you're the minnow.

Accordingly, Plaintiffs' claims under California law must be dismissed.

**B. Illinois Claim**

The Illinois subclass alleges that Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). Claims of deceptive acts or practices under the ICFA require the plaintiff to meet the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure. *See Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019). To state a claim under the ICFA, a plaintiff must allege: (1) a deceptive act or practice, (2) an intent for the consumer to rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage that was (5) proximately caused by the deception. *Castaneda v. Amazon.com, Inc.,* 679 F. Supp. 3d 739, 748 (N.D. Ill. 2023). Illinois law also incorporates the reasonable consumer standard. *See Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969 (7th Cir. 2020). The "reasonable consumer" standard "requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 474–75 (7th Cir. 2020).

Additionally, the plaintiff must demonstrate that the alleged consumer fraud proximately caused the claimed injury. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 675 N.E.2d 584, 593 (1996). To establish the element of proximate causation, "a plaintiff must prove that it was actually deceived by the misrepresentation. If the plaintiff has neither seen nor heard a deceptive

statement, it cannot have relied on the statement and, consequently, cannot prove that the statement was the proximate cause of its injury." *Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 476 Ill.Dec. 694, 241 N.E.3d 454, 462 (Ill. 2024); *see also De Bouse v. Bayer*, 235 Ill.2d 544, 337 Ill.Dec. 186, 922 N.E.2d 309, 316 (Ill. 2009) ("The basic principle in each of the foregoing cases is that to maintain an action under the Act, the plaintiff must actually be deceived by a statement or omission that is made by the defendant. If a consumer has neither seen nor heard any such statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause.").

Here, the Illinois Plaintiff's ICFA claim fails because Plaintiffs do not allege that they saw or heard the statements at issue. *See Gurrola v. Ford Motor Co.*, 774 F. Supp. 3d 959, 981 (N.D. Ill. 2025) (recognizing that a plaintiff who neither saw nor heard the allegedly deceptive statement cannot establish that the statement proximately caused the alleged injury); *Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 476 Ill. Dec. 694, 241 N.E.3d 454, 462 (Ill. 2024) ("If the plaintiff has neither seen nor heard a deceptive statement, it cannot have relied on the statement and, consequently, cannot prove that the statement was the proximate cause of its injury."); *see also De Bouse v. Bayer*, 235 Ill. 2d 544, 554, 337 Ill. Dec. 186, 922 N.E.2d 309, 316 (2009) ("If a consumer has neither seen nor heard any such statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause."). Accordingly, because Plaintiffs do not allege exposure to the challenged statements, they cannot establish the requisite causal connection between the alleged deception and their claimed injury. Hence, for the reasons already discussed above, the Illinois claims should be dismissed.

**C. Florida Claim**

The subclass of Florida Plaintiffs alleges violations under the Florida Deceptive and Unfair Trade Practices Act which prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce ...." § 501.204(1), Fla. Stat. (2016); *see Baptist Hosp., Inc. v. Baker*, 84 So.3d 1200, 1204 (Fla. 1st DCA 2012) (noting FDUTPA protects both the consuming public and legitimate business enterprises from such practices). The Florida Supreme Court has explained that "deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (quotation marks and citation omitted). Accordingly, actionable deception requires more than the mere possibility that a consumer could be misled; rather, there must be "probable, not possible, deception" that is "likely to cause injury to a reasonable relying consumer." *Millennium Commc'ns & Fulfillment, Inc. v. Off. of the Att'y Gen.*, 761 So. 2d 1256, 1263 (Fla. Dist. Ct. App. 2000).

An unfair practice "'offends established public policy' and ... is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (quoting *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So.2d 489, 499 (Fla. 4th DCA 2001)). To bring a FDUTPA claim for damages, a plaintiff must establish three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 212 (Fla. Dist. Ct. App. 2019). This claim must be "liberally construed to promote" and protect the consuming public and legitimate businesses in the community. *Id.*

A plaintiff must allege actual damages, rather than merely speculative losses. *See Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1101 (11th Cir. 2021) (affirming dismissal of the plaintiffs' FDUTPA claim where they failed to plausibly allege actual damages). Consistent with this requirement, "FDUTPA does not provide for the recovery of nominal damages, speculative losses, or compensation for subjective feelings of disappointment." *Butland v. Mut. Life Ins. Co. of N.Y.*, 951 So. 2d 860, 873 (Fla. 2d DCA 2007). Accordingly, a plaintiff must establish actual damages caused by the defendant's alleged deceptive conduct, and speculation as to the existence or cause of a purported loss is insufficient to establish recoverable damages under FDUTPA. *Id.*

Here, because the Florida claim hinges upon deception, it should be dismissed for the reasons stated above—nothing the Defendants said was untrue; and even if they were untrue, no Plaintiff alleges having heard them.

**D. Pennsylvania Claim**

Plaintiff Raynolds on behalf of the Pennsylvania subclass asserts violations of Pennsylvania Unfair Trade Practices and Consumer Protection Law. (FAC ¶ 20.) The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") prohibits unfair or deceptive conduct occurring in connection with trade or commerce. 73 Pa. Stat. § 201-3. The statute provides a private cause of action to individuals who suffer an ascertainable loss because of conduct prohibited by the UTPCPL. *See* 73 Pa. Stat. § 201-9.2. To establish a claim under the UTPCPL's catchall provision, a plaintiff must demonstrate: (1) conduct that is likely to deceive a reasonable consumer under the circumstances; (2) justifiable reliance upon the deceptive conduct; and (3) an ascertainable loss resulting from that reliance. *See Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285, 292 (W.D. Pa. 2014); *see also Seldon v. Home Loan*

*Servs., Inc.*, 647 F. Supp. 2d 451, 470 (E.D. Pa. 2009) (citing *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 223 (3d Cir. 2008)). This statute "is designed to protect the public from fraud and deceptive business practices." *Gardner v. State Farm Fire & Cas. Co.,* 544 F.3d 553, 564 (3d Cir. 2008).

Here, the Pennsylvania Plaintiffs' claim fails for reasons like those applicable to the Florida Plaintiffs. Plaintiffs have not sufficiently alleged an actionable misrepresentation or an injury caused by Defendants' alleged conduct. *See Thompson v. The Glenmede Tr. Co.*, No. 04428 FEB. TERM 2002, 2003 WL 1848011 (Pa. Com. Pl. Feb. 18, 2003) (dismissing the plaintiff's claim where the plaintiff failed to establish harm resulting from, or reliance upon, the defendants' alleged misrepresentations). Again, because no deception has plausibly been alleged, this claim should be dismissed.

**E. Ohio Claim**

The Ohio putative subclass asserts violations of the Ohio Consumer Sales Practices Act. Ohio Law provides that "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." Ohio Rev. Code Ann. § 1345.02(A). Generally, a practice is deceptive when it is likely to cause a consumer to form an understanding or belief that is inconsistent with the facts. *See Lee v. C.D.E. Home Inspection Co.*, 2002-Ohio-4316. By contrast, a practice is unfair when it involves unjust, inequitable, or deceptive conduct or otherwise results in unfair business dealings. *See Saraf v. Maronda Homes, Inc.*, 2002-Ohio-6741, ¶ 58.

Accordingly, for a supplier's conduct to constitute an actionable deceptive act, the challenged representation must be both false and material to the consumer's decision to purchase the relevant product or service. Information that is merely incidental or immaterial to a

consumer's purchasing decision does not constitute a deceptive practice under the CSPA. *Risner v. Regal Marine Indus., Inc.*, 8 F. Supp. 3d 959, 998 (S.D. Ohio 2014).

Not every consumer subjected to deceptive conduct may proceed through a class action under the OCSPA. *Pattie v. Coach, Inc.*, 29 F. Supp. 3d 1051, 1055 (N.D. Ohio 2014). Rather, a consumer seeking classwide relief must first establish both notice and injury. *Id.* The notice inquiry focuses on the defendant and requires a showing that, before engaging in the challenged conduct, either the Ohio Attorney General had already "declared [the seller's practice] to be deceptive or unconscionable" or an Ohio court had previously "determined [the practice] ... violate[s] [the OCSPA]." Ohio Rev. Code § 1345.09(B); *see also Pattie*, 29 F. Supp. 3d at 1055. The injury inquiry, in contrast, concerns the harm sustained by the plaintiff and requires the consumer to "allege and prove" that the challenged deceptive practice proximately caused "actual damages." *Felix v. Ganley Chevrolet, Inc.*, 145 Ohio St. 3d 329, 49 N.E.3d 1224, 1231 (2015).

Here, the Ohio Plaintiffs' claims should similarly be dismissed for the reasons set forth herein. Plaintiffs have not identified any alleged misrepresentation that was material to their decision to enter the transaction. *See Ewalt v. GateHouse Media Ohio Holdings II, Inc.*, No. 2:19-cv-4262, 2021 WL 4841064 (S.D. Ohio Oct. 18, 2021) (dismissing OCSPA allegations where the plaintiffs failed to sufficiently plead that the alleged misrepresentation was material or impacted their decision to purchase the product but affirming misrepresentations that were specific enough to be upheld under Rule 8); *see also Grgat v. Giant Eagle, Inc.*, 2019-Ohio-4582, ¶ 16, 135 N.E.3d 846 (holding that a deceptive act under the OCSPA must concern a fact or circumstance material to the consumer's decision to purchase the product or service).

### F. Colorado Claim

Plaintiff Dickey asserts a violation of the Colorado Consumer Protection Act. (FAC ¶ 289.) "A CCPA claim consists of five elements: (1) the defendant engaged in an unfair or deceptive trade practice; (2) in the course of its business; (3) significantly impacting the public as actual or potential consumers of the defendant's goods; (4) the plaintiff suffered an injury in fact to a legally protected interest; and (5) the practice caused the injury." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1120 (10th Cir. 2008); *see also Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142 (Colo. 2003). Moreover, the Second Circuit has observed that "Colorado has a heightened standard: 'To be a deceptive trade practice under the CCPA, a false or misleading statement must be made with knowledge of its untruth, or recklessly and willfully made without regard to its consequences, and with an intent to mislead and deceive the plaintiff.'" *Olson v. Major League Baseball*, 29 F.4th 59, 85 n.14 (2d Cir. 2022).

Here, as in *Olson*, "[s]ince [Dickey's] claims fail under the lower standards promulgated by other states' courts, they similarly fail under Colorado' s heightened standard." *Id.* (affirming dismissal of CCPA claim because, *inter alia*, no reasonable person would believe MLB games are free of cheating).

### G. New York Claim

Plaintiff Zelen asserts a claim under New York General Business Law § 349. (FAC ¶ 304.) "Unfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a). To state a viable GBL § 349 claim, a plaintiff must allege: (1) that the challenged act or practice was consumer-oriented; (2) that it was misleading in a material way; and (3) that the plaintiff suffered injury as a result of the deceptive act. *Oswego Laborers' Loc.*

*214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20 (1995); *Stutman v. Chem. Bank*, 95 N.Y.2d 24 (2000). This conduct must have a broader impact on a consumer rather than the individual. *Oswego Laborers' Loc. 214 Pension Fund*, 85 N.Y.2d at 25. New York also applies the "reasonable consumer standard." *Stutman*, 95 N.Y.2d at 611-12. Although reliance and causation are closely connected, they constitute distinct inquiries. A plaintiff need not allege that the transaction would not have occurred absent the alleged deception; rather, it is sufficient to show that the deceptive conduct resulted in a concrete loss. *Id.* at 612.

Here, as explained above, the New York Plaintiffs fail to plead an "actual injury" resulting from Defendants' purportedly deceptive conduct. Their claim under GBL § 349 claim should therefore be dismissed. *See Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 55–56 (1999) (dismissing a GBL § 349 claim where the plaintiffs failed to demonstrate actual harm and rejecting the theory that the alleged deception itself constituted a cognizable injury); *see also Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000) (holding that a plaintiff must establish actual injury caused by the defendant's deceptive act to recover under GBL § 349).

## IV. <u>Common Law Claims</u>

Defendants properly highlight that "Plaintiffs do not identify the law of any particular state governing these claims. They instead vaguely allude to 'the common law of each State for which claims are alleged.'" (ECF 77-1 at 40 (quoting FAC ¶ 182).) Notably, the "federal pleading rules and standards, including the Supreme Court's interpretation of Rule 8, prevail in 'all civil actions.'" *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). "[A] federal court sitting in diversity must test state-law claims against the standard in *Twombly* and *Iqbal*." *Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 247 (2d Cir. 2017). As such, when a

state claim is brought, federal courts require the plaintiff to plead facts to prove those state law elements. *See id.*

Plaintiffs here cite the Restatements, which, while persuasive, are not binding. *In re Fosamax Prods. Liab. Litig.*, 742 F. Supp. 2d 460, 472 (S.D.N.Y. 2010) (holding "a restatement is neither a statute nor a development of legislative code, but rather one organization's summary or opinion of certain principles of law"). Plaintiffs cite New York cases, but fail to cite the state law elements, which are required under the Rule 8 federal pleading standards. *See Tannerite Sports, LLC*, 864 F.3d at 247. As such, Plaintiffs' pleadings are deficient. Nevertheless, the court will proceed with its analysis assuming that New York law applies.[13]

**H. Conversion**

Conversion is defined as the "unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." *LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (internal quotation marks and citation omitted). To succeed on a conversion claim, New York law requires a plaintiff to show that (1) the defendant acted without authorization; (2) the defendant exercised dominion or a right of ownership of property belonging to plaintiff; (3) the plaintiff made a demand for the property; and (4) defendant refused the demand for the return of the property. *Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd.*, 888 F.

[13] A federal court exercising supplemental jurisdiction over state-law claims applies the choice-of-law rules of the forum state. *See Bass v. World Wrestling Fed'n Ent., Inc.*, 129 F. Supp. 2d 491, 503 (E.D.N.Y. 2001); *Carroll v. LeBoeuf, Lamb, Green & MacRae, L.L.P.*, 392 F. Supp. 2d 621, 628 (S.D.N.Y. 2005). Accordingly, New York choice-of-law rules apply, under which the Court first determines whether an actual conflict exists between the relevant jurisdictions. *See Bass*, 129 F. Supp. 2d at 503–04; *Long Beach Rd. Holdings, LLC v. Foremost Ins. Co.*, 75 F. Supp. 3d 575, 586–87 (E.D.N.Y. 2015). If the parties do not "demonstrate a true conflict between New York and another state's laws, no choice of law analysis need be undertaken." *Bass*, 129 F. Supp. 2d at 503–04. "[I]n the absence of a substantive conflict, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." *Long Beach*, 75 F. Supp. 3d at 586–87. Here, because neither party identifies an actual conflict or identifies any other law that might apply, no further choice-of-law analysis is necessary. *See id.* The Court therefore applies New York law. *See id.*

Supp. 2d 385, 396 (S.D.N.Y. 2012); *see Clark St. Wine & Spirits v. Emporos Sys. Corp.*, 754 F. Supp. 2d 474, 484 (E.D.N.Y. 2010).

To state a claim for conversion under New York law, "a plaintiff must show: (1) legal ownership or an immediate superior right of possession to a specific identifiable thing and (2) that the defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Ancile Inv. Co. Ltd. V. Archer Daniels Midland Co.*, 784 F.Supp.2d 296, 312 (S.D.N.Y. 2011). A plaintiff does not need to show that the defendant had knowledge that he acted wrongfully, "but merely an intent to exercise dominion or control over property in a manner inconsistent with the rights of another." *LoPresti*, 126 F.3d at 41. Conversion requires the defendant to exclude the true owner from exercising her rights over the goods at issue. *Pac. M. Int'l Corp.*, 888 F.Supp.2d at 396 (citing *Seventh Regiment Fund*, 774 N.E.2d at 702).

When an underlying act is alleged to be fraudulent, a claim of conversion must be pled with specificity under Fed. R. Civ. P. 9(b). *See Silverman Ptnrs., L.P. v. First Bank*, 687 F. Supp. 2d 269, 288 (E.D.N.Y. 2010) ("[T]he heightened pleading standards of Rule 9(b) apply to torts that are premised on the defendant's alleged fraudulent actions. Thus, breach of fiduciary duty, conversion, and unjust enrichment must be pled with specificity when the underlying acts are allegedly fraudulent."). In addition, where the underlying wrong with respect to the aiding and abetting conversion claim is fraud, actual knowledge must also be alleged with particularity pursuant to Rule 9(b). *In re Agape Litigation*, 773 F.Supp.2d 298, 307 (E.D.N.Y. 2011).

Here, Plaintiffs allege that the Defendants converted Plaintiffs' rightful winnings. (FAC ¶ 172.) Plaintiffs allege that the winnings were specific and identifiable amounts. (*Id.* at

¶ 173.) Furthermore, Plaintiffs allege that these specific amounts were wrongfully redistributed to the Insider Betting Group, reducing the Plaintiffs' winnings. (ECF 77-1 at 49.) However, as addressed above, fatal to the claim is Plaintiffs never plead that they won wagers and were paid reduced winnings. As Plaintiffs fail to establish the right to any winnings, Plaintiffs fail to establish "legal ownership or an immediate superior right of possession to a specific identifiable thing." *Ancile Inv. Co. Ltd.*, 784 F.Supp.2d at 312. Likewise, without a right to winnings that were improperly taken, Plaintifs fail to establish "unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." *LoPresti*, 126 F.3d at 41 (internal quotation marks and citation omitted). As such, Plaintiffs' conversion claim fails.

**I. Unjust Enrichment**

Under New York law, a claim for unjust enrichment has elements of (1) the defendant was enriched; (2) enrichment was at the plaintiff's expense; and (3) the defendant's retention of the benefit would be unjust." *Bartfield v. Murphy*, 578 F.Supp.2d 638, 648-49 (S.D.N.Y. 2008). In New York, unjust enrichment is an equitable remedy available in cases where there is no contract between the parties. *Marathon Enterprises, Inc. V. Schroter GMBH & Co.*, No. 01 Civ. 0595 (DC), 2003 WL 355238 at *9 (S.D.N.Y Feb. 18, 2003). It is rooted in the concept that a person should not be allowed to unjustly enrich themselves at the expense of another and will depend on "broad considerations of equity and justice." *Columbia Mem. Hosp. V. Hinds,* 192 N.E.3d 1128 (N.Y. 2022). Essentially, courts will determine if it goes against equity to permit a party to retain what is sought to be recovered by assessing whether "a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if

there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent." *Id.*

"The test for unjust enrichment was promulgated in *Miller v. Schloss*, 218 N.Y. 400, 113 N.E. 337 (1916), which held that unjust enrichment would only exist where no prior agreement governed the rights of the parties." *In re First Cent. Fin. Corp.*, 377 F.3d 209, 213 (2d Cir. 2004). For quasi-contract claims, such as unjust enrichment, "this principle has become formalized into a rule that generally bars a finding of unjust enrichment in the face of a valid and enforceable written agreement." *Id.*

Plaintiffs allege that Defendants were improperly enriched at their expense by rigging the pari-mutuel betting pools and "worsening the odds for the average consumer." (ECF 77-1 at 50.) However, as previously stated, the Plaintiffs fail to plead that they won bets and received reduced winnings due to the presence of the Insider Betting Group. Consequently, there are no allegations that the Defendants were enriched at the Plaintiffs' expense. *See Bartfield*, 578 F.Supp.2d at 648-49.

Furthermore, Defendants properly highlight that an unjust enrichment claim must fail if there is a valid and enforceable contract governing the relationship between the Plaintiffs and Defendants. (ECF 77-1 at 43-44); *see also In re First Cent. Fin. Corp.*, 377 F.3d at 213. For Plaintiffs to participate in the pari-mutuel betting pools on Defendants' apps and platforms, Plaintiff had to agree to terms and conditions that would govern these transactions. (*Id.*) Plaintiffs argue that these agreements are not relevant binding contracts, alleging that "the terms and services do not focus on the operation of the pari-mutuel pools" and that "[t]he unlawful operation of these pools is the subject matter of the case." (ECF 77-2 at 50.) However, these claims are unfounded, as these agreements which gatekeep entry onto the betting platforms, aim

to regulate gambling on the pari-mutuel pool platforms. (*See* ECF 77-1 at 43-44.) As Plaintiffs and Defendants are bound by these valid contracts governing their relationship as platform manager and gambler, the unjust enrichment claim must fail as a matter of law. *See In re First Cent. Fin. Corp.*, 377 F.3d at 213.

**J. Conspiracy**

New York law does not recognize an independent substantive tort of civil conspiracy. *Pope v. Rice*, No. 04 Civ. 4171 (DLA), 2005 WL 613085 at *13 (S.D.N.Y. Mar. 14, 2005) (citing *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 251 (2d Cir. 1985). Rather, a claim for civil conspiracy requires "evidence of an underlying actionable tort." *Id.* (quoting *Missigman v. USI Northeast, Inc.*, 131 F. Supp. 2d 495, 517 (S.D.N.Y. 2001)). The independent underlying tort must be any "unlawful" act, or a "lawful" act done "in an unlawful manner." *Dell's Maraschino Cherries Co., Inc. v. Shoreline Fruit Growers, Inc.*, 887 F.Supp.2d 459, 482 (E.D.N.Y. 2012) (citing *Arlinghaus v. Ritenour*, 622 F.2d 629, 639 (2d Cir. 1980)). Ultimately, a plaintiff's allegations of conspiracy must serve to connect a defendant's conduct "with an otherwise actionable tort." *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F.Supp.2d 485, 504 (S.D.N.Y. 2003).

Once an underlying tort is established, a claimant must demonstrate the elements of civil conspiracy which are: "(1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage." *Pope*, 2005 WL 613085 at *13. (quoting *Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986) (applying New York law). As is the case with criminal conspiracies, civil conspiracy agreements are not easily shown by direct evidence, "but may be inferred from circumstantial

evidence." *Dell's Maraschino Cherries Co.,* 887 F.Supp.2d at 482 (quoting *Cofacredit S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 240 (2d Cir. 1999)).

Here, Plaintiff alleges that the underlying tort is RICO conspiracy. (ECF 77-2 at 29.) Pleading a RICO conspiracy requires a demonstration of "an agreement to commit predicate acts." *Elsevier v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 313 (citing Hecht, 897 F.2d at 25; see 18 U.S.C.A. § 1962(d)). There must be "some factual basis for a finding of a conscious agreement among the defendants." *Id.*

Even if Plaintiffs could plausibly allege that Defendants conspired to give the Insider Betting Group special advantages, alleging RICO conspiracy alone is insufficient to establish the requisite underlying tort for a civil conspiracy claim. *See Dell's Maraschino Cherries Co., Inc.*, 887 F.Supp.2d at 482. RICO conspiracy, without an adequate and complete RICO claim, is not "an otherwise actionable tort." *UniCredito Italiano SPA*, 288 F.Supp.2d at 504. Plaintiffs have failed to assert an adequate RICO claim (*see supra* at § II) and a mere allegation of RICO conspiracy is not sufficient to establish an underlying tort necessary to plead civil conspiracy in New York. *Pope*, No. 04 Civ. 4171 (DLA), 2005 WL 613085 at *13. Thus, Plaintiffs' conspiracy claim fails as a matter of law.

Accordingly, Plaintiffs' claims for conversion, unjust enrichment, and conspiracy should be dismissed.

## V. The Individual Motions

In addition to the omnibus motion to dismiss addressed thus far, which is recommended that should result in full dismissal, several Defendants (or groups of Defendants) submitted their own briefs as well with several distinct arguments. Nevertheless, in the event the District Judge

may disagree with the above analysis, the undersigned proceeds to address the following additional arguments that apply only to specific Defendants.

The Court addresses each below.

### A. The Churchill Downs and United Tote Motion (ECF No. 78-1): Terms and Conditions Prevent Plaintiffs from Bringing Class Claims

The Churchill Down Defendants assert that Plaintiffs Dickey, Seevers, Monnin, Raynolds, Paladino, and O'Brien agreed to class action waivers in the terms and conditions agreements of the wagering platforms of TwinSpires or Keeneland Select. (ECF No. 78-1 at 6.)[14] As a general proposition, class action waivers in consumer terms and conditions, whether embedded in arbitration agreements or standing alone, can be enforceable. *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013). Whether the purported waiver is enforceable here, however, is a question for another day. The waiver is not properly before the Court.

"[E]vidence outside of the Complaint may not be considered by the Court when deciding a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6)." *Oxman v. Downs*, 999 F. Supp. 2d 404, 406 (E.D.N.Y. 2014) (citing *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 113 (2d Cir. 2010)). Indeed, "a district court errs when it considers affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda, in ruling on a 12(b)(6) motion to dismiss." *Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000) (citation modified).

To be sure, "[t]here are exceptions to Rule 12(b)(6)'s general prohibition against considering materials outside the four corners of the complaint." *Halebian v. Berv*, 644 F.3d 122, 131 n.7 (2d Cir. 2011). For instance, courts may consider "(1) facts alleged in the

[14] The Defendants concede that Plaintiff Zelen did not waive his right to participate in a class action, but argue that his claims against Churchill Downs fail nonetheless for lack of standing. (ECF No. 78-1 at 7.)

complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, [and] (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint," among other things. *Env't Servs., Inc. v. Recycle Green Servs., Inc.*, 7 F. Supp. 3d 260, 270 (E.D.N.Y. 2014) (internal citation omitted). Crucially, however, the Second Circuit has clarified that "a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis in original); *see also id.* n.4 (considering contracts submitted by defendants where the complaint was "replete with references to the contracts and request[ed] judicial interpretation of their terms").

Here, Plaintiffs did not rely upon the purported class action waiver. They mention it in the preamble to the FAC only to explain why they amended the Complaint; they do not concede its terms, validity, or even existence. (*See* FAC at ¶¶1–4 (explaining that Defendants had moved to dismiss the original Complaint because Plaintiff Dickey was "purportedly" subject to an arbitration clause, and recounting Plaintiffs' position that "even if" that were true the claims still stand).) As such, the Court cannot consider it. This argument of the Churchill Down Defendants fails.

### B. The NYRA Motion (ECF No. 79-1): Whether NYRA is Shielded from Monetary RICO Damages as a State Entity

NYRA argues that, "as a state actor," it is exempt from monetary damages under RICO. (ECF No. 79-1 at 8.) Although municipalities can be sued for injunctive relief under RICO, the Second Circuit declined to decide whether they can be sued for monetary relief. *Gingras v.*

*Think Fin., Inc.*, 922 F.3d 112, 125 (2d Cir. 2019). Defendants cite *Soybel v. City of New York*, No. 21-CV-1846 (CBA) (MMH), 2024 WL 5482682, at *9–10 (E.D.N.Y. Mar. 15, 2024), for the proposition that municipalities are immune from monetary damages. (ECF No. 79-1 at 8–9.) Plaintiffs appear to agree with that statement of law, as they neither distinguish *Soybel* nor cite other cases to the contrary. (ECF No. 79-2 at 7.) As Plaintiffs correctly point out, however, NYRA is not a municipality. (*Id.*) It is a unique quasi-public entity.

The question of whether NYRA is exempt from monetary damages is not purely a matter of law (*i.e.*, how far do *Gingras* and *Soybel* go). It is a question of fact. The record is unclear as to what exactly NYRA is. Plaintiffs note that NYRA itself, in a different litigation, has taken the position that it is a *private* entity; Defendants respond that the District Court there rejected that argument and "ruled that NYRA is a state actor." *Baffert v. The New York Racing Association, Inc.*, Case No. 1:21-cv 03329-CBA-RML, ECF Nos. 18, 58. Plaintiffs here, in the FAC, allege that "[w]hile technically independent, [NYRA] functions as a quasi-public entity." (FAC at ¶ 33.) Given the murky factual record, this question is inappropriate for a motion to dismiss. Discovery is necessary to determine whether NYRA is relevantly analogous to a municipality—for instance, but not limited to, whether a judgment against it would be paid by taxpayer money. *See Cornetta v. Town of Highlands*, 434 F. Supp. 3d 171, 181 (S.D.N.Y. 2020) (explaining that the Second Circuit's "primary concern with permitting plaintiffs to assert RICO claims for damages against municipalities is the dilemma of 'imposing the burden of punitive damages on taxpayers based on misconduct of a public official'" (quoting *Gingras*, 922 F.3d at 125)).

Accordingly, this prong of NYRA's motion should be denied.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss (ECF Nos. 77, 78, 79, 80 81) should be granted in full.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served through ECF on all counsel. Any written objections to this Report and Recommendation must be filed within fourteen (14) days of service of this Report. 28 U.S.C. § 636(b)(1) (2006 & Supp. 2011); Fed. R. Civ. P. 6(a), 72(b); *see also Nambiar v. The Central Orthopedic Group LLP*, No. 24-1103 (2d Cir. Oct. 28, 2025) (addressing timing and scope of objections to Reports and Recommendations). Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days precludes further review of this Report and Recommendation either by the District Court or the Court of Appeals. *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("In general, failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.") (internal citation omitted); *see also Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (summary order) (same).

Dated: Central Islip, New York
October 23, 2026

**RESPECTFULLY RECOMMENDED,**

/s/ *James M. Wicks*
JAMES M. WICKS
United States Magistrate Judge